RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 11a0135p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,
              *Plaintiff-Appellee,*

        *v.*

        No. 09-1946

ROBERT C. GENSCHOW, SR.,
              *Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Michigan at Marquette.
No. 08-00018-001—Robert Holmes Bell, District Judge.

Argued: January 18, 2011

Decided and Filed: May 19, 2011

Before: BOGGS, SUHRHEINRICH, and STRANCH, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Richard D. Stroba, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Grand Rapids, Michigan, for Appellant. Jeff J. Davis, ASSISTANT UNITED STATES ATTORNEY, Grand Rapids, Michigan, for Appellee. **ON BRIEF:** Paul L. Nelson, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Grand Rapids, Michigan, for Appellant. Jeff J. Davis, ASSISTANT UNITED STATES ATTORNEY, Grand Rapids, Michigan, for Appellee.

_____

**OPINION**

_____

SUHRHEINRICH, Circuit Judge. Defendant-Appellant Robert C. Genschow, Sr., a member of the Keweenaw Bay Indian Community, was convicted of destroying trees on the Ontonagon Reservation in violation of 18 U.S.C. § 1853, and stealing tribal property for his own use in violation of 18 U.S.C. § 1163. On appeal, Genschow claims

1

his conviction was improper because he had a right to use the land as chief of the Ontonagon Band. He further contends that his sentence was improper because he did not receive an acceptance of responsibility reduction and the imposed restitution award was too large. We **AFFIRM**.

## I. BACKGROUND

The Keweenaw Bay Indian Community ("KBIC") is a federally recognized tribe with reservation and trust lands in Michigan's Upper Peninsula. The KBIC's lands include an 80-acre parcel of unpopulated, tribal trust land on the Ontonagon Reservation in Michigan's Ontonagon County (the "Property").[1] Genschow asserts that the Property is reserved for the use and benefit of the Ontonagon Band. Genschow, who is a member of the KBIC, maintains that he is Chief Lonewolf, chief of the Ontonagon Band.

### A. History of the Ontonagon Band and the Property[2]

Because Genschow claims he acted rightfully and in his capacity as chief of the Ontonagon Band, we begin with a review of historical events related to the tribe and the Property. In 1854, the Chippewa of Lake Superior entered into a treaty with the United States that required them to cede certain lands to the United States. In consideration for this land, the United States agreed to "set apart and withhold from sale" land for several bands of Chippewa including the L'Anse, Vieux Desert, and Ontonagon Bands. *Id.*

In 1855, President Franklin Pierce issued an Executive Order defining the boundaries of the land reserved for the Ontonagon Band. Parcels of this land were subsequently allotted to individual members, and in 1875, the Property was patented to an individual named Menogezhick (also known as Me-no-ge-zhick, Antoine Jocco, and

---

[1] The precise location of the Property is the West half of the Northwest quarter of Section 26 in Township 53 North, of Range 38 West (W1/2, NW 1/4 of Sec. 26, T53N, R38W).

[2] As the district court noted, the parties collectively did a tremendous job in supplying the court with the relevant historical documents.

Antoine Jocko). Yet, because he later received another allotment of land within Wisconsin's Bad River Reservation, Menogezhick relinquished the Property in 1912.[3]

By 1935, in response to the Indian Reorganization Act adopted the year prior, the L'Anse, Lac Vieux Desert, and Ontonagon Bands began discussions with the Department of the Interior ("DOI") about organizing as a single tribe called the Keweenaw Bay Indian Community. As a part of this effort, the group drafted a Constitution and By-laws.

DOI Field Agent Peru Farver held three meetings with the group as it completed this task. Farver submitted the Constitution to the Superintendent of the Lac du Flambeau Agency, J.C. Cavill, who was also serving as the Chairman of the KBIC Constitution Committee. In the attached letter, dated December 2, 1935, Farver described the Ontonagon Band's motivations for creating the KBIC:

> The Ontonagon Band is included in this group because the Ontonagon Reservation no longer exists. There are only a few scattered pieces of Indian land left within the confines of the original reservation, and it is understood only one Indian family resides there. Most of the Ontonagon Band now being located at L'Anse, and affiliated with the L'Anse people. It is satisfactory with the L'Anse Indians that the Ontonagon Band be included in their organization, which appears to be a happy solution for this band.

Letter from Peru Farver, Field Agent, Dep't of the Interior, to J.C. Cavill, Superintendent, Lac du Flambeau Agency (Dec. 2, 1935) [hereinafter Farver Letter].

A few days later, on December 9, 1935, Cavill also received correspondence from Field Clerk E.J. Warren, who addressed the affiliations between the three bands and further illuminated the status of the Ontonagon Band:

> While the Ontonagon Reservation has always been spoken of and designated as a separate reservation the fact is the only thing that ever really took place on the Ontonagon Reservation was the allotting of land in severalty to certain Indians—those living on the territory. No village or reservation was ever established at that point in recent years. Most of

---

[3]The United States acknowledged this relinquishment by canceling Menogezhick's deed.

the lands were sold, and today only a few of the original allotments,
inherited land, are still intact and unsold.  No Indians now reside upon
the Ontonagon Reservation and only one or two reside in that section of
the country.

Letter from E.J. Warren, Field Clerk, Dep't of the Interior, to J.C. Cavill,
Superintendent, Lac du Flambeau Indian Agency (Dec. 9, 1935) [hereinafter Warren
Letter].

On June 15, 1936, Assistant Commissioner of Indian Affairs, William
Zimmerman, sent his comments on the proposed KBIC Constitution to Cavill.
Zimmerman recommended the omission of any reference to the Ontonagon Reservation,
because "it appears that all of the Indians of the Ontonagon Band actually live on the
L'Anse Reservation" and because "the community has jurisdiction only over the lands
included within the L'Anse Reservation."  Letter from William Zimmerman, Jr.,
Assistant Commissioner,  Dep't of the Interior, to J.C. Cavill, Superintendent, Lac du
Flambeau Indian Agency (June 15, 1936).

In November 1936, the L'Anse, Lac Vieux Desert, and Ontonagon Bands of
Chippewa Indians adopted the Constitution to form the KBIC.[4]  The Preamble states:

> We, the L'Anse, Lac Vieux Desert and Ontonagon Bands of Chippewa
> Indians residing within the original confines of the L'Anse Reservation,
> in order to organize as a tribe for the common welfare of ourselves and
> our posterity . . . do order and establish this Constitution and By-laws,
> our community which shall be known as the Keweenaw Bay Indian
> Community.

Constitution And By-Laws of the Keweenaw Bay Indian Community Nov. 7, 1936,
pmbl.  Article I provides that the territorial jurisdiction "shall embrace the land within
the original boundary lines of the L'Anse Reservation . . . and any and all future
additions of land acquired within or without said boundary line by the Secretary of the
Interior or by the Tribe . . . ."  *Id*. art. I.  And Article VII provides that the KBIC's lands
include "unalloted lands of the Community, and all lands which may hereafter be

---

[4]The ratified Constitution incorporated Zimmerman's recommendation.

acquired by the Community or by the United States in trust for the Community . . . ." *Id*. art. VII.

Several government documents speak to the status of the Ontonagon Band and the Property following the formation of the KBIC.  The Field Solicitor's Code of Tribes and Land Units, dated December 1965, lists Michigan tribes as including "Keweenaw Bay" and "Ontonagon, Keweenaw Bay," among others.  Dep't of the Interior, Code Of Tribes And Land Units 4 (1965).  There is no independent listing for the Ontonagon Band.

In June 1971, a memorandum addressing the status of the tribal land on the Ontonagon Reservation passed from the Acting Area Director of the DOI's Bureau of Indian Affairs ("BIA"), Minneapolis Area Office to the Superintendent of the Great Lakes Agency.  The memorandum speculated that the tribal land, including the Property, did not fall within the jurisdiction of the KBIC, belonging instead to "an unorganized tribe . . . independent from all other existing groups" and further stated that "the tribal tracts had reverted to tribal ownership . . . probably subsequent to the organization of the [KBIC]."  Memorandum from Acting Area Dir., Bureau of Indian Affairs, Dep't of the Interior to the Superintendent, Great Lakes Agency (June 22, 1971) [hereinafter 1971 BIA Memorandum].  The memorandum concluded with an inquiry for advice on the issue and a directive to "request verification of the title status of this property from our Title and Records Section." *Id*.

The resulting Title Status Report, dated July 1971, lists an 80-acre parcel located at "[t]he West half of the Northwest quarter of Section Twenty-six of Township Fifty-three North of Range Thirty-eight West of the Michigan Meridian in Ontonagon County, Michigan."  Chief, Titles and Records Section, Aberdeen Area Office, Bureau of Indian Affairs, Dep't of the Interior, Title Status Report 1 (1971).  Although the report identifies "Ontonagon Band of Chippewa Indians" as the property owner, it lists the Property's Reservation Code as 476, which denotes "Ontonagon, Keweenaw Bay." *Id*. at 2.

In 1975, a group of individuals wrote to the BIA, seeking to organize as "The Ontonagon Band of Lake Superior Chippewa Indians." Letter from Alma Chosa Tilden to Morris Thompson, Comm'r of Bureau of Indian Affairs, Dep't of the Interior (Dec. 5, 1975). The BIA replied that "[t]he only Ontonagon Band of which we are aware is organized together with the L'Anse and Lac Vieux Desert Bands to make up the [KBIC]" and denied the request. Letter from Robert Pennington, Acting Chief, Div. of Tribal Gov't Serv., Bureau of Indian Affairs, Dep't of the Interior to Alma Chosa Tilden (undated) [hereinafter BIA Response Letter].

In 1992, The DOI Field Solicitor, Mark Anderson, wrote to the Area Director of the BIA's Minneapolis Area Office in response to a request about which tribal entity had the right to exercise jurisdiction over a public domain allotment within the Ontonagon Reservation. Anderson concluded, based on the language of the KBIC Constitution, that the land was "not subject to the jurisdiction of the [KBIC] or any other federally-recognized tribal government." Letter from Mark A. Anderson, Office of the Solicitor, Dep't of the Interior, to Earl J. Barlow, Area Dir., Minneapolis Area Office, Bureau of Indian Affairs, Dep't of the Interior (Jan. 28, 1992).

In 2004, in response to a request regarding leasing land held by the United States in trust for the Ontonagon Band of Indians, DOI Field Solicitor, Priscilla A. Wilfahrt, wrote to the Regional Director of the BIA's Midwest Regional Office: "Our files indicate that the Ontonagon Band of Indians voted to organize with the L'Anse Chippewa Indians to form the [KBIC]. Thus the property held for the Ontonagon Band, since it no longer exists, should be deemed to be held by the [KBIC]." Letter from Priscilla A. Wilfahrt, Field Solicitor, Office of the Solicitor, Dep't of the Interior, to Terry Virden, Reg'l Dir., Midwest Reg'l Office, Bureau of Indian Affairs, Dep't of the Interior (July 2, 2004) [hereinafter 2004 Field Solicitor Opinion] (citations omitted).

The 2004 Field Solicitor Opinion determined that the earlier 1992 Field Solicitor Opinion was not controlling because the KBIC, "acting in a proprietary capacity[,] could execute a lease for this property whether or not it may exercise regulatory jurisdiction over the property." *Id*. It concluded that the KBIC, as the successor in interest to the

Ontonagon Band, "had the rights of any property owner to manage and control the use of its property." *Id.*[5]

In 2008, the BIA certified that the Property was held in trust by the United States for the KBIC. The certification explained the history of the Property: Menogezhick received an allotment to the Property in 1875, upon cancellation of the allotment in 1912, the Property reverted to the Ontonagon Band, "which is now under the jurisdiction of the [KBIC]" per the 2004 Field Solicitor Opinion. Esther M. Thompson, Realty Officer, Bureau of Indian Affairs, Dep't of the Interior, Certification (2008) [hereinafter BIA Certification].

**B. Genschow And The Property**

In August 2007, Genschow arranged for the logging and clearing of the Property. In late September 2007, a KBIC Officer visited the Property and discovered that approximately five acres had been cleared and stripped of all topsoil. Stakes marked out a building site on the cleared ground. During a return trip to the site, the KBIC Officer encountered Genschow, who explained that he planned to construct a building to house an Ontonagon Band tribal office and personal living quarters for himself. Thereafter, KBIC's President wrote to the BIA and reported the unauthorized clearing of the Property.

In October 2007, a BIA criminal investigator interviewed Genschow. At that time, Genschow admitted to clearing the land, but asserted that he did so in his capacity as Chief Lonewolf. During the interview, Genschow contended that he possessed a letter from a KBIC tribal chairman, confirming that the Ontonagon Band was an entity separate from the KBIC, but refused to share the letter with the BIA investigator.

---

[5]The 2004 Opinion also explained that the 1992 Opinion did not preclude the KBIC from exercising regulatory authority over the trust land because the Secretary of the Interior acquired the land in 1971, years after the KBIC ratified its Constitution, and, therefore, it fell within the "future additions" provision of the Constitution. This explanation incorrectly assumes that Ontonagon Band acquired the Property after the formation of the KBIC. Although a Title Status Report issued in 1971, the Ontonagon Band received the Property upon Menogezhick's relinquishment in 1912, well before it decided to join the L'Anse and Lac Vieux Desert Bands in forming the KBIC.

Genschow also admitted that he had not sought permission from the KBIC to clear the Property or construct a structure.

### C. Procedural History

In April 2008, the government indicted Genschow on two counts. Count One alleged that, pursuant to 18 U.S.C. § 1853, Genschow "did unlawfully cut and wantonly injure and destroy, and did cause to be unlawfully cut and wantonly injured and destroyed, trees growing, standing, or being upon an Indian reservation, or lands belonging to or occupied by the [KBIC]." Count Two alleged that pursuant to 18 U.S.C. § 1163, Genschow "did embezzle, steal, knowingly convert to his own use or the use of another, and willfully misapply property of an Indian tribe" by entering into a contract with a logging company, wherein the logging company "would be compensated with logs removed and from stumpage moneys obtained from the lands known as the Ontonagon Reservation, which are held in trust by the United States for the use and occupancy of the [KBIC]."

Genschow moved to dismiss the indictment for lack of jurisdiction, arguing that the indictment was defective because the KBIC had no authority over the Property. Genschow claimed that the trust lands on the Ontonagon Reservation continued to be reserved for the use and benefit of the Ontonagon Band of Chippewa Indians and that as a member of the Ontonagon Band, he has a right to the use and enjoyment of the Property. For these reasons, Genschow alleged that the court lacked jurisdiction and requested dismissal.

The district court denied Genschow's motion to dismiss. After thoroughly reviewing the historical record surrounding the Ontonagon Reservation, the district court found that the Property, after Menogezhick's relinquishment, had reverted to the Ontonagon Band in 1912. Thus, the KBIC as the successor in interest to the Ontonagon Band, retained authority over the Property. The district court concluded that the indictment was not defective for attributing ownership of the Property to the KBIC. Genschow appealed the decision. Because the district court's order was not a final,

appealable order, this court denied the motion for lack of jurisdiction. *United States v. Genschow*, No. 08-2539 (6th Cir. Jan. 23, 2009).

The district court conducted a bench trial on March 23 and 24, 2009.[6]  The government's presentation included statements from several KBIC members who testified that they had never heard Genschow refer to himself as "Lonewolf" or "Chief Lonewolf" until after he had the Property cleared for his tribal building.

Genschow testified in his own defense.  The essence of Genschow's defense was that because he genuinely believed that the Ontonagon Band continued to exist and continued to be the entity for which the government held the Property, he lacked the requisite intent element for the charged crimes. He claimed that the Ontonagon Band continued to exist as an independent tribe because several members of the original Ontonagon Band had not voted to merge with the KBIC.  Genschow further testified that the remaining Ontonagon Band members selected him when he was a baby to be the next chief of the tribe, a role he assumed at the age of 24.  In support of his claim that the Ontonagon Band continued as a separate entity from the KBIC, Genschow submitted a copy of the Ontonagon Band Constitution.  The copy bore only his own signature and Genschow testified that the original was destroyed in a fire, along with other records of the document's ratification.  Genschow further acknowledged that to his understanding he is currently the only living member of the Ontonagon Band.

The district court found Genschow guilty of Count One, explaining that the KBIC owned the Property and Genschow admitted to cutting trees on the Property.  With respect to Count Two, which requires specific intent, the district court rejected the good faith defense attempted by Genschow, stating that Genschow's testimony "stretche[d] credulity."  The district court explained that Genschow selectively chose to believe certain information and to ignore evidence to the contrary.  Moreover, the court noted that because Genschow had repeatedly tried to become a part of the KBIC Tribal Council, he possessed an understanding of the requirements of tribal communities to

---

[6]Genschow waived his right to a jury trial.

comply with the law.  The district court concluded that Genschow's actions did not evince a good faith belief in his right to use the property and found Genschow guilty of Count Two.

Prior to sentencing, Genschow submitted a written "acceptance letter" to the probation department.  It read in part:

> I, Robert Genschow, do hereby accept responsibility for my actions.  It was my decision to undertake to have the land cleared on the Ontonagon Reservation; and I, alone, am responsible for any and all consequences. However, these actions were taken by me as Chief of the Ontonagon Band of Lake Superior Chippewa Indians and were being undertaken for what I believed was the benefit of that Ontonagon Band. . . . I am very sorry for the trouble and difficulties I have caused everyone - the Keweenaw Bay Indian Community, the BIA, the United States Attorney's Office and this Court.  Still, while I now recognize that this Court has determined my actions to have been wrong, I continue to believe that I acted honorably and in good faith, sincerely believing in the continued existence of the Ontonagon Band and its ancestral lands in Ontonagon.  Yet I now clearly understand that any actions I might take in the future for the benefit of the Ontonagon Band must be undertaken in accordance with federal law and, when appropriate, through both the BIA and Congress.

Presentence Report ¶ 27.

The Presentence Report ("PSR") set Genschow's base offense level at 6, pursuant to U.S. Sentencing Guidelines Manual § 2B1.1(a)(2) (2008), and added 6 levels, pursuant to U.S. Sentencing Guidelines Manual § 2B1.1(b)(1)(D) (2008), because the offense involved a loss greater than $30,000 but less than $70,000, for a total offense level of 12.  The PSR did not include a recommendation for an acceptance of responsibility adjustment and set Genschow's criminal history category at "I."  As a result, the PSR recommended a sentence of ten to sixteen months.  The PSR also recommended restitution of $47,200, based on a DOI damage appraisal that included $21,100 in timber damages and $26,100 in unaccounted perimeter damage.  Genschow filed a sentencing memorandum in which he objected to the PSR.

Just prior to sentencing, the President of the KBIC submitted a victim impact statement. The letter described the sacred traditions of the Chippewa, or Ojibwe, which include hunting, fishing, and food gathering from the land. It elaborated on the efforts of the KBIC to preserve and protect their land and waters for future generations. The letter concluded by explaining that Genschow's actions destroyed KBIC resources and offended KBIC traditions.

At sentencing on July 9, 2006, the district court concluded that Genschow had regret for the consequences of his actions but did not possess the requisite acceptance of responsibility to justify a reduction under U.S. Sentencing Guidelines Manual § 3E1.1(a). Regarding restitution, the district court heard testimony from a government witness who elaborated on the PSR estimates of $21,100 in timber damages and $26,100 in unaccounted perimeter damage. Ultimately, the district court ordered Genschow to ten months in federal prison, two years of supervised release, and restitution of $47,200 payable to the KBIC.

This appeal followed.

## II. ANALYSIS

### A. Motion to Dismiss

### 1. Standard of Review

The district court's conclusion that the Property was held in trust for the KBIC is a mixed question of law and fact. Our review is de novo. *See McKenna v. Edgell*, 617 F.3d 432, 448-49 (6th Cir. 2010) ("Mixed questions of law and fact . . . are sometimes reviewed deferentially—when the relevant dispute concerns the underlying facts—and are at other times reviewed de novo—when the relevant dispute concerns the application of law to the underlying facts."); *see also Yankton Sioux Tribe v. Podhradsky*, 606 F.3d 994, 1004 (8th Cir. 2010) (applying a de novo standard to a mixed question of law and fact in a dispute over tribal land boundaries in the diminishment context); *Osage Nation v. Irby*, 597 F.3d 1117, 1122 (10th Cir. 2010) (same).

**2. Merits**

Genschow asserts that there is no subject matter jurisdiction because the Ontonagon Band continues to exist and is the entity for which the government holds the Property in trust. The government counters that the district court properly determined that the Ontonagon Band ceased to exist when it became the KBIC and that the government holds the Property in trust for the KBIC.

**a. Existence of the Ontonagon Band**

BIA regulations provide the procedures for acknowledging when American Indian groups exist as tribes. 25 C.F.R. § 83.1-13 (2011). Federal recognition matters because "[a]cknowledgment of tribal existence by the Department is a prerequisite to the protection, services, and benefits of the Federal government available to Indian tribes by virtue of their status as tribes." 25 C.F.R. § 83.2. Apart from formal recognition, individuals at one time associated with a tribe cannot independently continue the tribe by refusing to adhere to a tribal decision; instead, individual tribe members "dissolve their connection" with their tribe when they refuse to abide by the decision of the tribe. *E. Band of Cherokee Indians v. United States*, 117 U.S. 288, 309 (1886); *see also Delaware Tribal Bus. Comm. v. Weeks*, 430 U.S. 73, 86 (1977).

Genschow presented no evidence that the Ontonagon Band has complied with the BIA regulations to establish itself as a federally recognized tribe. Genschow cites the 1854 Treaty with the Chippewa as evidence of recognition of the Ontonagon Band, but that does not operate to replace federal recognition by virtue of the BIA procedures. *See United Tribe of Shawnee Indians v. United States*, 253 F.3d 543, 548 (10th Cir. 2001) (concluding that a treaty from the 1850s does not speak to present-day tribal status). Instead, the historical evidence indicates that the majority of the Ontonagon Band decided to organize as a federally recognized tribe known as the KBIC in 1936. *See* Farver Letter, *supra* (explaining that most of the Ontonagon Band lived on the L'Anse reservation); Constitution And By-Laws of The Keweenaw Bay Indian Community Nov. 7, 1936, pmbl. ("We, the . . . Ontonagon Band of Chippewa Indians

residing within the original confines of the L'Anse Reservation . . . [establish] our community . . . the Keweenaw Bay Indian Community.").

Regarding Genschow's claim that the Ontonagon Band continued separately from the KBIC, there is some evidence that at least one or two Ontonagon Band members lived apart from the majority of the tribe living on the L'Anse reservation. Warren Letter, *supra*. Nonetheless, any decisions by individual Ontonagon Band members to forego joining their tribe in establishing the KBIC did not continue the Ontonagon Band as an independent entity. *See E. Band*, 117 U.S. at 309; *see also id.* at 303 (describing members who chose not to join the newly created Cherokee nation as "without organization or a collective name"). Documents created since the Constitution indicate that the Ontonagon Band exists today only as the KBIC. BIA Response Letter, *supra* ("The only Ontonagon Band of which we are aware is organized . . . to make up the [KBIC]."); *see also* 2004 Field Solicitor Opinion, *supra*; Letter from Susan J. La Fernier, President, KBIC, to Gerald Parish, Superintendent, Bureau of Indian Affairs, Dep't of the Interior (Oct. 2, 2007). Furthermore, the list of federally recognized tribes includes the KBIC and does not include an independent Ontonagon Band. Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs, 75 Fed. Reg. 60810 (2010).

### b. The KBIC Retains Interest in the Property

"It is settled that whatever title the Indians have is in the tribe, and not in the individuals, although held by the tribe for the common use and equal benefit of all the members." *United States v. Jim*, 409 U.S. 80, 82 (1972) (citation omitted). Because tribal land belongs to the tribe as a political body, it retains the ability to make decisions about the disposition of its land. *See E. Band*, 117 U.S. at 308.

The Ontonagon Band received its interest in the Property in 1912 through Menogezhick's relinquishment. It retained this interest until 1936 when it decided to establish the KBIC. By virtue of this decision, the Ontonagon Band's property interests became those of the KBIC. Plainly, the KBIC is the successor in interest to the Property. The idea that the KBIC is the successor in interest of the Ontonagon Band should come

as no surprise as we have repeatedly recognized it as such. *See Keweenaw Bay Indian Cmty. v. Rising*, 569 F.3d 589, 591 (6th Cir. 2009) (describing the KBIC as "a federally recognized Indian tribe and the successor in interest to the L'Anse and Ontonagon bands of Chippewa Indians"); *Keweenaw Bay Indian Cmty. v. Naftaly*, 452 F.3d 514, 516 (6th Cir. 2006) (same).

Genschow contests this conclusion by citing the language from the KBIC Constitution that restricted the territorial jurisdiction of the KBIC at its formation to the "land within the original boundary lines of the L'Anse Reservation." While the terms of the KBIC Constitution do not explicitly establish authority over the Property, several other documents do. The 2008 BIA certification supports the conclusion that the Property belongs to the KBIC as the Ontonagon Band's successor in interest, as does the 2004 DOI Field Solicitor Opinion.

Genschow relies on the 1992 Field Solicitor Opinion and 1971 BIA Memorandum to demonstrate that the Property is not held for the KBIC. Yet, neither of these documents are persuasive on this issue. The 1992 Field Solicitor Opinion did not address interest in the Property; rather, it considered the KBIC's potential regulatory jurisdiction over a public domain allotment held in the estate of a deceased L'Anse Chippewa Indian. The 1971 BIA Memorandum speculated that the Property did not belong to the KBIC and, instead, belonged to "an unorganized tribe . . . independent from all other existing groups." 1971 BIA Memorandum, *supra*. But this assertion was predicated on the incorrect assumption that the Property reverted to tribal ownership *after* the formation of the KBIC. In any event, the memorandum concluded by requesting title status verification. A Title Status Report issued the next month and assigned a reservation code of 476 to the Property, which reflects ownership by the "Ontonagon, Keweenaw Bay" tribe.

Based on the extensive historical record and the well-settled principles of tribal land ownership, we conclude that the Ontonagon Band ceased to exist in 1936 when it established the KBIC and that the government now holds the Property in trust for the

KBIC.  As such, the indictment was not defective as alleged, and the district court properly denied the motion to dismiss.

### B. Acceptance of Responsibility Reduction

On appeal, Genschow asserts that the district court erred by focusing primarily on his criminal offense conduct when it denied him an acceptance of responsibility reduction.  Genschow maintains that, when considering his eligibility for the reduction, the district court ought to have confined its analysis to the events occurring after Genschow was on notice of the federal authorities' interest in his activities on the Property.

### 1. Mootness

We first consider whether this issue is moot.  Genschow's sentence included ten months of imprisonment and two years of supervised release, of which the term of imprisonment is complete.  While it is true that he has served his custodial sentence, he is still serving his two years of supervised release.  Presumably, if we were to remand this issue, the district court could eliminate or reduce the duration of his term of supervised release; accordingly, this issue is not moot.  *See United States v. Maken*, 510 F.3d 654, 656 n.3 (6th Cir. 2007) ("Even when an appellant has been released from custody, his case is not moot so long as the appeal potentially implicates the length of the appellant's supervised release term." (internal citation and quotation marks omitted)).

### 2. Merits

The district court's decision to deny Genschow an acceptance of responsibility reduction is entitled to great deference on review.  U.S. Sentencing Guidelines Manual § 3E1.1 cmt. 5 (2008).  We review for clear error.  *United States v. Webb*, 335 F.3d 534, 537-38 (6th Cir. 2003).[7]

---

[7] In his briefs before this Court, Genschow argues for de novo review and cites in support our unpublished decision in *United States v. Hakley*, 101 F. App'x 122 (6th Cir. 2004).  In *United States Webb*, 335 F.3d 534, 538 (6th Cir. 2003), we explicitly stated that the correct standard is a deferential one in light of *Buford v. United States*, 532 U.S. 59, 64-65 (2001).  To the extent that *Hakley* contradicts this pronouncement, *Webb* is controlling.  *See* 6th Cir. R. 206(c) (2009).

Merely expressing regret for the consequences of the criminal conduct, without admitting wrongful intent, does not constitute acceptance of responsibility within the meaning of the Guidelines. *United States v. Williams*, 940 F.2d 176, 183 (6th Cir. 1991); *United States v. Sloman*, 909 F.2d 176, 182 (6th Cir. 1990). Although the district courts retain "discretion in determining the time period for acceptance of responsibility," this discretion is not unbridled. *United States v. Jeter*, 191 F.3d 637, 640 (6th Cir. 1999), *abrogated on other grounds*, *Buford v. United States*, 532 U.S. 59 (2001). The defendant "must be on notice that the federal government has an interest in his or her affairs before § 3E1.1 comes into play." *Id.* at 639-40; *see also United States v. Clements*, 142 F. App'x 223, 227-28 (6th Cir. 2005) (concluding, after reviewing Sixth Circuit case law, that the considerations of conduct occurring after some form of notice is reasonable).

At sentencing, the district court heard testimony regarding Genschow's acceptance letter, in which he stated in part, "while I now recognize that this Court has determined my actions to have been wrong, I continue to believe that I acted honorably and in good faith." The district court concluded that while Genschow felt regret for the consequences of his actions, he did not demonstrate the required acceptance of responsibility. Regret alone does not warrant a reduction. *Williams*, 940 F.2d at 183. Further, the district court clearly did not rely exclusively on pre-notice conduct, given that the sentencing hearing included testimony about the acceptance letter. As a result, we find no clear error in the district court's denial of an acceptance of responsibility reduction.

## C. Restitution

The district court awarded restitution in the amount of $47,200 to account for the value of the removed timber and the cost of restoring the Property. Genschow challenges this award, arguing that the restitution award ought to reflect the property's current fair market value, an approach which would have reduced Genschow's financial

obligation to the KBIC.[8]   We review the amount of the district court's award for an abuse of discretion.  *United States v. Elson*, 577 F.3d 713, 725 (6th Cir. 2009) (citing *United States v. Boring*, 557 F.3d 707, 713 (6th Cir. 2009)).

The Mandatory Victims Restitution Act ("MVRA") requires a district court to order full restitution for offenses against property.   18 U.S.C. §§ 3663A(a)(1), 3663A(b)(1), 3663A(c)(1) (2000); *Elson*, 577 F.3d at 721.  In determining the restitution amount, the statute "unambiguously tells a court *what* to value" (i.e., the property lost less any property returned), but "is silent . . . on the question of *how* the referenced property is to be valued."  *United States v. Boccagna*, 450 F.3d 107, 114 (2nd Cir. 2006) (citing 18 U.S.C. § 3663A(b)(1)) (emphasis added).  Although fair market value may often be the most appropriate measure of full restitution, the MVRA by its terms in no way indicates that fair market value is the only contemplated or permissible measure of restitution.  *Id*. at 114-15.[9]  When destroyed property is unique or lacks a broad and active market, a court may look to the replacement cost to satisfy the statute.  *See United States v. Shugart*, 176 F.3d 1373, 1375 (11th Cir. 1999); *Boccagna*, 450 F.3d at 116 (same).  In other words, "'value,' as § 3663A uses that term, contemplates a restitution order based on replacement cost where actual cash value is unavailable or unreliable." *Shugart*, 176 F.3d at 1375.[10]

---

[8] Because land near the Property is often used for recreational purposes, Genschow contended that the value of the Property had actually increased by virtue of his actions.  Thus, using the fair market value of the Property as a basis for the restitution award would serve to decrease or eliminate the amount of money Genschow owed the KBIC.  The fair market value Genschow proposed did not explicitly take into account any of the damage done to the property.

[9] In support of his claim that the district court should have utilized a market-based calculation Genschow cites *United States v. Warshawsky*, 20 F.3d 204 (6th Cir. 1994), and a case citing *Warshawsky*. In *Warshawsky*, we  recognized that "'fair market value' is the proper measure of the value" of stolen property for purposes of establishing the offenders' base offense level under the U.S. Sentencing Guidelines.  *Id*. at 212 (citing U.S. Sentencing Guidelines § 2B1.1).  Genschow challenges the calculation of the restitution award, not the value of the Property as it related to his offense level under the Sentencing Guidelines, thus, *Warshawsky* is not dispositive.

[10] *Elson* is not to the contrary.  In *Elson*, the defendant pled guilty to conspiracy to obstruct a grand jury investigation.  577 F.3d at 719.  The district court's restitution award included compensation for victims of the fraud, including an attorney.  On appeal, Elson challenged the restitution award and argued that the MVRA does not allow for "consequential damages" like attorney fees.  We disagreed.  We explained that "the MVRA restricts restitution to the replacement value of the property" and found that in situations, like Elson's, where the offense does not involve physical damage to or destruction of property, the MVRA "requires only that the restitution ordered by the district court be based on losses caused by the specific conduct that is the basis for the offense of conviction."  *Id*. at 726 (citations and

In *Shugart*, vandals torched a century-old church cherished by its congregation. It burned to the ground. The district court ordered the defendant to pay restitution based on the cost of rebuilding the church. On appeal, the Eleventh Circuit considered whether the MVRA allowed restitution awards based on replacement cost when using the fair market value of the property would have resulted in a different, and presumably lesser, award. The court explained that "[f]or fungible commodities, value is easy to determine: it's the actual cash value, or fair market value, of the item… ." *Id.* The court found that a church is not a fungible commodity, but instead, "is unique, and is valued by its members, precisely because of its location, its design, and the memories it evokes." *Id.* For that reason, the court concluded that fair market value was not an appropriate measure for restitution and upheld the district court's award. *Id.*

Tribal land similarly holds unique value in that its pristine, natural condition allow tribes to partake in and to preserve tribal traditions. *See* Letter from Warren C. Swartz, President, KBIC, to U.S. Probation Office (July 1, 2009). Any court's attempt to transform somehow this value into an actual market figure would most certainly be difficult and unreliable. Because we conclude the Eleventh Circuit's analysis in *Shugart* was persuasive, we hereby adopt its rule and conclude that when destroyed property is unique or lacks an active market such that the actual cash value is unreliable or unavailable, using replacement value as a measure for restitution is proper under the MVRA. We therefore hold that the district court did not abuse its discretion in awarding restitution.

## III. CONCLUSION

For the foregoing reasons the judgment of the district court is **AFFIRMED**.

---

quotation marks omitted). The restitution award, which covered costs incurred by the attorney while defending himself against fraudulent lawsuits filed by Elson and while attempting to collect on a related civil judgment, met this standard. *Id*. at 727-29.