NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0811n.06

No. 13-2499

<table>
<tr><td>UNITED STATES COURT OF APPEALS<br>FOR THE SIXTH CIRCUIT</td><td>FILED<br>Oct 27, 2014<br>DEBORAH S. HUNT, Clerk</td></tr>
</table>

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff – Appellee, | ) ON APPEAL FROM THE |
| | ) UNITED STATES DISTRICT |
| v. | ) COURT FOR THE WESTERN |
| | ) DISTRICT OF MICHIGAN |
| SANGCHAENH SENGMANY, | ) |
| | ) |
| Defendant – Appellant. | ) |

Before: GIBBONS and KETHLEDGE, Circuit Judges; DOW, District Judge.[*]

DOW, District Judge. Defendant Sangchaenh Sengmany pled guilty to an indictment charging him with (1) conspiracy to distribute and possess with intent to distribute 50 grams or more of methamphetamine and (2) being a felon in possession of a firearm. At sentencing, Sengmany contested the amount of drugs attributed to him for purposes of the Sentencing Guidelines, objected to an enhancement of his offense level for possession of firearms in connection with the offense, argued that he should not receive an enhancement for his role in the offense, and maintained that he should receive a reduction in his offense level for acceptance of responsibility. The district judge overruled all of Sengmany's objections to the guideline calculations, calculated an offense level of 42 and a criminal history category of IV, and concluded that the factors set out in 18 U.S.C. § 3553(a) and the arguments advanced by counsel in mitigation did not merit a significant reduction from the advisory guideline range. Although

---

[*] The Honorable Robert M. Dow, Jr., Judge for the Northern District of Illinois, sitting by designation.

her rulings resulted in a guideline range of 360 months to life, the district judge imposed a sentence of 240 months. Sengmany now appeals his sentence, raising essentially the same arguments that he raised before the district judge. For the reasons set forth below, we affirm.

I.

In November 2012, a federal grand jury returned a seven-count indictment charging Sangchaenh Sengmany, a citizen of Laos who was living in Holland, Michigan, and three co-conspirators, Amber and Amanda Dordon and Phetmany Choummanivong, with methamphetamine and gun-related offenses. Sengmany entered a plea of guilty to two counts—conspiracy to distribute and possess with intent to distribute 50 grams or more of methamphetamine (count one) and felon in possession of a firearm (count four)—in exchange for dismissal of the other counts. During his change of plea hearing, Sengmany told the magistrate judge that he received "three to four" packages of methamphetamine in the mail, each containing an ounce of the drug, for which he paid $1,000 or $1,500. He admitted that he sold a ball of methamphetamine (three grams) to Amber Dordon "[t]hree times a month," "one gram" once to Amanda, and a gram "three to four times" to Choummanivong. He also acknowledged using the three firearms found at his residence for hunting, although he claimed that the guns belonged to his wife. In accepting his plea, the magistrate judge expressed frustration, commenting that Sengmany appeared to be "not coming clean with the Court."

After Sengmany entered into a written plea agreement with the government, the United States Probation Department prepared a presentence report ("PSR"). The factual information in the report was taken largely from law enforcement reports of witness interviews as well as grand jury testimony. The report found Sengmany responsible for 809.4 grams (29 ounces) of methamphetamine: 27.2 grams recovered via an intercepted U.S. Mail package from California

2

delivered to one of Sengmany's residences on December 1, 2011; 113.4 grams that he provided to Vilay Keodouangdy, a former "runner" for Sengmany; 57 grams that he provided in 2005-06 to Claire Parks, a woman whom investigators had interviewed; and 640 grams that he provided to Amber and Amanda Dordon between June 1 and December 1, 2011. Based on that total drug quantity, the report assigned a base offense level of 36, which applies to crimes involving at least 500 grams, but less than 1.5 kilograms, of "ice" methamphetamine.[1] The report also assessed a two-level enhancement for possessing a dangerous weapon, citing Vilay Keodouangdy's grand jury testimony that Sengmany gave him a rifle to protect himself and the drugs, as well as a four-level leadership enhancement. Finally, the report recommended denying Sengmany a three-level reduction for acceptance of responsibility, stating that he failed to acknowledge his full involvement in the offense, including the number of drug packages sent to his residence, his relationship with Amber Dordon and the quantity of methamphetamine that he sold to her, and the fact that he had provided Keodouangdy with a firearm and ammunition in connection with their drug trafficking.

The PSR also set forth Sengmany's criminal history, which included convictions for aggravated burglary, drunk driving and driving without a license (multiple times), illegal entry, felon in possession, and felonious assault on his then-girlfriend, who later became his wife.[2] The PSR provided a guideline range of 360 months to life based on a total offense level of 42 and a criminal-history category of IV.

---

[1] The intercepted package contained methamphetamine with a purity of 98.3%, which qualified it as "ice."

[2] In regard to the assault conviction, the report stated that the victim's right eye and lips were swollen, that she had blood on her face, that Sengmany had kicked the victim several times in the stomach, and that officers had found a .22 caliber rifle with a round in the chamber on the kitchen floor. At the time of the offense, Sengmany was arrested and determined to have a blood alcohol content of .16%. After his arrest, the victim told police that Sengmany had threatened her with a knife and pointed the gun at her head saying he was going to kill her.

Prior to sentencing, Sengmany filed a *pro se* motion to withdraw his guilty plea, claiming that he did not understand the plea agreement, that his attorney had not explained it to him, and that his attorney had pressured him into signing it. After a hearing, the district court denied Sengmany's motion, finding that he was not maintaining his innocence and that his motion reflected "buyer's remorse," but "nothing * * * to support the defendant's claim that he was somehow intimidated into signing the plea agreement."

At sentencing, Sengmany contested the amount of drugs attributed to him and the enhancements for possession of firearms in connection with the offense and for his role in the offense. He also argued that he should receive a deduction from his offense level for acceptance of responsibility. After considering the PSR, sentencing memoranda, the arguments of counsel, and hearing testimony from Sengmany, as well as from a postal inspector about the drugs delivered to two residences at which Sengmany lived, the district court overruled all of Sengmany's objections to the guideline range set out in the PSR and determined that the range was 360 months to life.

Regarding drug quantity, the district court stated that it was difficult to find "any credibility" in Sengmany's testimony that "he got on five occasions one ounce of the drug, smoked half of it, and gave away or sold to these others the other three, the remainder of these drugs, and that's all there was." The district court acknowledged that Sengmany used the drugs for personal consumption, but also noted that he was "responsible for doling them out for distribution and sale." The court highlighted the postal inspector's testimony about 17 suspicious packages delivered from California (of similar weight and size to a package of approximately one ounce of methamphetamine intercepted by postal inspectors in December 2011) to two addresses where Sengmany lived or admitted receiving packages. The court further

4

noted that it did not find credible Sengmany's testimony that he did not know about all of the deliveries. Finally, the court pointed to testimony by the Dordon sisters and Vilay Keodouangdy that Sengmany regularly supplied them with drugs.

The district court also found that the government had met its burden of showing that Sengmany possessed a firearm during his drug-trafficking offense. The court referenced Sengmany's attempts to distance himself from the firearms—they were for hunting or they were his wife's—but concluded that Vilay Keodouangdy's testimony that Sengmany provided him with use of a gun for protection of himself and the drugs was more credible than Sengmany's. In addition, the district court denied Sengmany credit for acceptance of responsibility, finding that he had "persistently attempted to minimize his role." The court noted that "it was a little bit like pulling teeth" for him to admit the actual basis for his guilty plea in the first instance and then noted that his "reluctance, unwillingness, [and] sense of denial" had continued through the proceedings.

After ruling on Sengmany's objections, the district court considered the § 3553(a) factors, and noted that many—his abandonment of his wife and children, his extensive criminal history, and his lack of cooperation—did not reflect favorably on him. Although the court concluded that the § 3553(a) factors and defense arguments did not warrant a significant reduction from the guideline range, in considering what sentence would be sufficient but not greater than necessary to achieve the goals of sentencing, the court concluded that 360 months to life was "a bit beyond the pale" and imposed a sentence of 240 months, 120 months below the low end of the range.

II

Sengmany raises four issues on appeal. First, he contends that the evidence was not sufficient to support the district court's finding that he was responsible for more than 500 grams

of methamphetamine.  Second, he contends that the district court erred when it assessed a two-level enhancement for Sengmany's possession of a firearm during the conspiracy and declined to reduce his offense level to reflect acceptance of responsibility.  Finally, he argues that the 240-month sentence was unreasonable because the district court incorrectly calculated the guideline range.  As set forth below, because we conclude that Sengmany's first three arguments fail to demonstrate clear error by the sentencing judge, we need not reach his final argument that the alleged errors resulted in an inflated guideline range.

A.

In order to determine the base offense level for sentencing purposes, the district court must determine the quantity of drugs for which a defendant is responsible.  Sengmany contends that the district court erred in concluding that he was responsible for distributing at least 500 grams of methamphetamine "ice," which resulted in assignment of a base offense level of 36.  We review the district court's factual finding as to the amount of methamphetamine attributable to Sengmany for clear error.  *United States v. Samuels,* 308 F.3d 662, 670 (6th Cir. 2002) (citing *United States v. Jenkins,* 4 F.3d 1338, 1345-46 (6th Cir. 1993)).  "A drug quantity need only be established by a preponderance of the evidence, and an estimate will suffice so long as it errs on the side of caution and likely underestimates the quantity of drugs actually attributable to the defendant."  *United States v. Anderson,* 526 F.3d 319, 326 (6th Cir. 2008).  Further, "a district court's approximation of drug quantity is not clearly erroneous if it is supported by competent evidence in the record."  *United States v. Jeross*, 521 F.3d 562, 570 (6th Cir. 2008).  For instance, "testimonial evidence from a coconspirator may be sufficient to determine the amount of drugs for which another coconspirator should be held accountable."

*United States v. Swanberg,* 370 F.3d 622, 625 (6th Cir. 2004) (quoting *United States v. Hernandez,* 227 F.3d 686, 697 (6th Cir. 2000)).

The evidence in the record, much of it discussed in detail in the PSR (which the district court adopted) and referenced by the court at sentencing, supports a finding that Sengmany was responsible for at least 500 grams of methamphetamine. The district court, relying partially on coconspirator testimony as well as testimony from the postal inspector, discussed the 17 suspicious packages delivered to Sengmany's two residences, each containing at least one ounce of methamphetamine. Although Sengmany points out that 17 one-ounce (28 gram) packages total 476 grams—less than the 500-gram threshold for base offense level 36—the record reflects that Vilay Keodouangdy told law enforcement that Sengmany often paid $3,000 for two ounces at a time. There also was evidence indicating that Sengmany and his coconspirators occasionally obtained methamphetamine from other sources. Finally, the amounts that Sengmany supplied to Amanda and Amber Dordon alone crossed the 500-gram threshold.[3] *See United States v. Porter*, 560 Fed. App'x 543, 545 (6th Cir. 2014) (observing that "time and again" this Court has held that "[t]estimonial evidence from a coconspirator may be sufficient to determine the amount of drugs for which another coconspirator should be held accountable") (quoting *Swanberg*, 370 F.3d at 625); *see also United States v. Cohen*, 515 Fed. App'x 405, 412-13 (6th Cir. 2013) (noting that district court may base its fact-finding on the prior statements of conspirators "so

---

[3] The PSR attributed 640 grams to Sengmany based on his transactions with the Dordon sisters. Amanda claimed that she and Amber operated an "every day, all day operation" in which Sengmany supplied them at least 3.5 grams of methamphetamine daily, which they broke down into smaller portions and sold. As the government pointed out in its sentencing memorandum, even using the lower amount of 1.8 grams per day for June and July 2011 that Amber Dordon admitted to, and the 3.5 grams per day figure for August 1 to December 1, 2011, that Amber confirmed, the amount was at least 528 grams. Thus, any error in the court's decision to adopt the 640 grams quantity rather than the 528-grams quantity proposed by the government was harmless given the 500-grams threshold. *See, e.g., United States v. Lanesky*, 494 F.3d 558, 561 (6th Cir. 2007) (alleged sentencing error is harmless if it did not cause the defendant to receive a more severe sentence).

7

long as 'it is not obvious that the statements were untruthful'") (quoting *United States v. Milan*, 398 F.3d 445, 457 (6th Cir. 2005)).

Sengmany also claims the district court erred in failing to consider his personal drug use, and thus the court inflated the amount of drugs he intended to or did distribute. While the court noted Sengmany's personal use, it highlighted the amounts set forth in the PSR, which accounted for over well over 500 grams. The court then referenced "the mountain . . . of evidence of the others," concluding that it could not be reconciled with Sengmany's testimony as to how much methamphetamine he kept for personal use. Indeed, the statements and testimony in the PSR from the Dordon sisters, Vilay Keodouangdy, and Claire Parks about the quantities that they received from Sengmany, as well as corroborating evidence of packages delivered to Sengmany's residences, support the conclusion that the district judge reached—namely, that Sengmany was responsible for "a great deal more of the methamphetamine than he [was] willing to acknowledge." We accord "great deference to such credibility determinations," *United States v. Navarro–Camacho,* 186 F.3d 701, 705 (6th Cir. 1999), because the district court is "in the best position to judge credibility," *United States v. Bradshaw,* 102 F.3d 204, 210 (6th Cir. 1996) (finding it not clearly erroneous for the district court to credit testimony and articulate, on its own, plausible explanations for apparent inconsistencies). As the district court reasoned, the other evidence could not be reconciled with Sengmany's statements as to personal use, and her decision to credit that evidence over Sengmany's testimony was not clearly erroneous. *See United States v. Gauna*, 485 Fed. Appx. 70, 74-75 (6th Cir. 2012).

Sengmany's strongest argument is that the district court was not permitted to rely on Claire Parks' grand-jury testimony, given that Parks' testimony referenced transactions that occurred in 2005-06, well before the indictment in this case. *See, e.g., United States v. Hill*, 79

F.3d 1477 (6th Cir. 1996) (remote and dissimilar drug sales will not qualify as relevant conduct). Although the district judge did not reference Parks' testimony during sentencing, it was part of the PSR calculation and thus she implicitly must have included it in adopting the PSR figures. But even if the district court counted the 57 grams that Sengmany allegedly provided to Parks in her estimate, as set forth above, the quantities that Sengmany supplied the Dordon sisters alone cross the 500-gram threshold for base offense level 36, so any error in relying on the transactions with Parks (if in fact the district court did so) was harmless. *See*, *e.g.*, *Lanesky*, 494 F.3d at 561 (alleged sentencing error is harmless if it did not cause the defendant to receive a more severe sentence).

In short, Sengmany asks the Court to believe his version of the events—in which he denies receiving many of the packages from California and supplying his coconspirators with the quantities that they attested to—over the testimony and statements of his coconspirators and other witnesses. Where two permissible views of the evidence exist, and where the testimony of Defendant's coconspirators was corroborated by evidence of actual drug deliveries to Sengmany's residence of anywhere from 17 to 34 ounces of methamphetamine, we cannot find clear error in the district court's decision to discredit Sengmany's version of the events. *See Anderson v. City of Bessemer,* 470 U.S. 564, 573-74 (1985) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."); *Jeross*, 521 F.3d at 570 (credibility determinations accorded great deference).

B.

Sengmany next contends that the district court erred when it assessed a two-level enhancement for possession of a firearm during the drug conspiracy. As with the district court's finding as to drug quantity, a finding that a defendant possessed a firearm during a drug crime is

a factual finding reviewed for clear error. *United States v. Darwich*, 337 F.3d 645, 664 (6th Cir. 2003).

The Sentencing Guidelines call for a district court to apply a two-level increase if the defendant possessed "a dangerous weapon (including a firearm)." U.S.S.G. § 2D1.1(b)(1). Application note 11 to § 2D1.1 provides in relevant part: "The enhancement for weapon possession in subsection (b)(1) reflects the increased danger of violence when drug traffickers possess weapons. The enhancement should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense."

To apply the § 2D1.1(b)(1) enhancement, the government has the initial burden of showing by a preponderance of the evidence that (1) the defendant actually or constructively possessed the weapon, and (2) such possession was during the commission of the offense, or during "relevant conduct." *United States v. Greeno,* 679 F.3d 510, 514 (6th Cir. 2012); *United States v. Faison,* 339 F.3d 518, 520 (6th Cir. 2003). "'Constructive possession of an item is the ownership, or dominion or control over the item itself, or *dominion over the premises where the item is located.*'" *United States v. Wheaton*, 517 F.3d 350, 367 (6th Cir. 2008) (emphasis in original) (quoting *United States v. Hill,* 79 F.3d 1477, 1485 (6th Cir. 1996) (citation and internal quotation marks omitted)). "Relevant conduct" includes "'all acts and omissions . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction.'" *Faison,* 339 F.3d at 520 (quoting U.S.S.G. § 1B1.3(a)(2)). Once the government meets its burden, a rebuttable presumption arises that the weapon was connected to the offense. *Greeno,* 679 F.3d at 514. The burden then shifts to the defendant to show that it was "clearly improbable" that the weapon was connected to the offense. *Id.*

Sengmany admitted through his guilty plea that he unlawfully possessed three firearms found at one of his residences (the Lot 102 residence) in or around December 2011 (while the conspiracy was ongoing), including two .22 caliber rifles. Thus, a presumption arose that the enhancement applied and the burden shifted to Sengmany to demonstrate that it was clearly improbable that the firearms were connected to his drug crimes. Sengmany argues that he rebutted the presumption because he was not living at the Lot 102 residence where the guns were found. But he was living at the 136th Avenue residence, where the .22 caliber ammunition matching one of the rifles was found. And, even by his own admission, he was receiving methamphetamine at the Lot 102 residence.

Sengmany argues that he has carried his burden because he testified that he used the guns for hunting. But the district court found that Sengmany's testimony was not credible. We have no reason to second-guess that determination, so that argument fails. It was not clear error for the district court to discredit Sengmany's story and to conclude that he therefore did not rebut the presumption.

C.

In his final specific challenge, Sengmany contends that the district judge erred in declining to reduce his offense level to reflect acceptance of responsibility. Because the district court "is in a unique position to evaluate a defendant's acceptance of responsibility . . . the determination of the [court] is entitled to great deference on review." U.S.S.G. § 3E1.1 cmt. n.5. Therefore, we again review for clear error, *see United States v. Genschow,* 645 F.3d 803, 813 (6th Cir. 2011), and the district court's determination "will not be overturned unless it is without foundation." *United States v. Morrison,* 983 F.2d 730, 732 (6th Cir. 1993).

Section 3E1.1(a) of the guidelines provides for a two-level decrease in a defendant's offense level "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense[.]" In determining whether a defendant has accepted responsibility, the district court may consider whether the defendant truthfully admits, or does not falsely deny, "any additional relevant conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct)." U.S.S.G. § 3E1.1, cmt. (n.1(A)). Although "a defendant is not required to volunteer, or affirmatively admit, relevant conduct beyond the offense of conviction in order to obtain a reduction . . . a defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility." *Id.*; *see also United States v. Chalkias*, 971 F.2d 1206, 1216 (6th Cir. 1992) (defendants' efforts to minimize their roles in drug conspiracy justify denial of reduction for acceptance of responsibility); *United States v. Reeves*, 100 Fed. App'x 470, 471 (6th Cir. 2004) (noting that a "defendant's attempt to minimize his own role in the offense is inconsistent with acceptance of responsibility") (citing *United States v. Edwards*, 272 F.3d 812, 816 (6th Cir. 2001)).

The district court did not clearly err in determining that Sengmany did not accept responsibility and therefore was not entitled to a reduction in his offense level on that basis. There was ample evidence in the transcript of the plea proceeding, in the PSR, and at the sentencing hearing to show that Sengmany had not accepted responsibility and had instead tried to minimize his role in the conspiracy. *See Genschow,* 645 F.3d at 813. The PSR recommended denying Sengmany a reduction for acceptance of responsibility, stating that he failed to acknowledge his full involvement in the offense, including the number of drug packages sent to his residence, his relationship with Amber Dordon and the quantity of methamphetamine that he

sold to her, and the fact that he had provided Keodouangdy with a firearm and ammunition in connection with their drug trafficking. At the sentencing hearing, he continued his pattern of minimization, contending that he was only responsible for five packages of methamphetamine, plus the three that he claimed he allowed others to send to his residences. As previously set forth, the district court did not clearly err in finding that his testimony as to drug quantity and possession of firearms was not credible in light of other statements and testimony. By extension, the district court did not err in determining that Sengmany failed to earn credit for accepting responsibility when he continued to minimize his role in the conspiracy.

## III.

For the reasons stated above, the judgment of the district court is affirmed.