[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-13282

_____

D.C. Docket No. 4:18-cr-10001-JEM-2

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

JARRED ALEXANDER GOLDMAN,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(March 25, 2020)

Before ROSENBAUM, TJOFLAT, and HULL, Circuit Judges.

ROSENBAUM, Circuit Judge:

In Robert Louis Stevenson's *Treasure Island*, Jim Hawkins memorably

hunted for Captain Flint's hidden treasure. *The Goonies* put its own spin on treasure

hunting when the title band of friends defied One-Eyed Willy's maze of booby traps to find his hidden treasure and save their beloved neighborhood.  But for real-life treasure-hunting stories, perhaps nothing beats the quests of the aptly named Mel Fisher and his company Treasure Salvors, Inc.

Fisher and his team specialized in finding and salvaging shipwrecks of Spanish galleons and other vessels from the Spanish Colonial era, off the coasts of Florida and its Keys.  As of the mid-1980s, Fisher's operation had recovered treasure worth approximately $400 million at that time.

Among that treasure was Gold Bar 27, which Fisher donated to the Mel Fisher Maritime Heritage Museum (the "Museum") in Key West, Florida.  There, Gold Bar 27 became iconic, and three to four million Museum visitors handled it over the years.

Enter Defendant-Appellant Jarred Alexander Goldman (sometimes truth can be stranger than fiction) and Codefendant Richard Steven Johnson.  In 2010, Goldman and Johnson stole Gold Bar 27 from the Museum.  This appeal requires us to consider the proper standard—we might call it the gold standard—for determining, for purposes of ordering restitution under the Mandatory Victims Restitution Act, 18 U.S.C. § 3663A ("MVRA"), the value of Gold Bar 27.

Today we take this golden opportunity to reaffirm that in a case like this one, where the loss is of a unique artifact for which market value cannot fully compensate,

courts must use replacement cost in determining restitution.  While absolute precision is not required under the MVRA, the district court must base its restitution order on evidence.  And that evidence must show that the restitution will make the victim whole—nothing more and nothing less.  Because the district court, without the benefit of our decision today, did not ascertain replacement value when it determined market value was insufficient and then imposed restitution, we vacate the restitution order and remand for valuation that applies the proper legal *bar*ometer to the gold bar here.

Goldman also challenges the loss amount used to determine his offense level. But here, we part ways with Goldman's analysis.  The district court explained that it would impose the same sentence, even if it had the loss figure wrong.  For that reason and because the sentence the district court imposed is not substantively unreasonable, we affirm Goldman's sentence.

# I.

We pick up Gold Bar 27's story in 1622.  A Spanish fleet of ships set sail from Spain to various parts of the Americas to pick up cargos of gold, silver, tobacco, copper, and other goods to take back to Spain.[1]  After they obtained their cargos, the

---

[1] Regrettably, slave labor and other deplorable practices were used to procure some of these goods.  *See Gold, silver and sugar*, Discovering Bristol – an online history of the port and its people, http://www.discoveringbristol.org.uk/slavery/routes/places-involved/south-america/gold-silver-sugar/ (last visited Mar. 25, 2020).

ships convened in Havana, Cuba.  Among these ships was the *Santa Margarita*, which carried Gold Bar 27.  In all, 28 vessels—including the Tierra Firme Fleet and its guard ships—then launched from Cuba to begin their return to Spain with their bounty.  The idea was that there was safety in numbers.[2]

Unfortunately, though, traveling in a group could not protect the ships from severe weather.  Without the benefit of modern weather technology, the ships left Havana on September 4, 1622, smack in the thick of hurricane season.  And sure enough, within 24 hours of the fleet's departure, a hurricane descended upon the vessels.  Seven of the 28 ships sank in the waters between Cuba and the Florida Keys or smashed on the reefs of the Florida Keys.  Among these were the *Nuestra Señora de Atocha*[3] ("*Atocha*") and the *Santa Margarita*.  So Gold Bar 27, onboard the sunken *Santa Margarita*, sat on the bottom of the ocean for hundreds of years.

Then, in 1969, Fisher and his team began searching the waters of the Florida

---

[2] The Spanish ships sought to protect themselves from several threats.  At this time, pirate attacks occurred.  *See Atocha & Margarita Story*, Mel Fisher's Treasures, https://www.melfisher.com/Library/AtochaMargStory.asp (last visited Mar. 25, 2020).  In addition, the Tierra Firme Fleet sailed during the course of the Thirty Years War (1618-1648) and the Eighty Years War (1568-1648).  *Id.*; *Thirty Years' War*, HISTORY, https://www.history.com/topics/reformation/thirty-years-war (last visited Mar. 25, 2020); *Eighty Years' War*, Encyclopædia Britannica, https://www.britannica.com/event/Eighty-Years-War (last visited Mar. 25, 2020).  And just a year before the Tierra Firme Fleet left Havana, in 1621, Spain ended a twelve-year truce with its Dutch provinces, which had been in a state of rebellion.  *Atocha & Margarita Story*, *supra*.  The Dutch then began attacking Spanish naval and merchant vessels.  *Id.*

[3] The *Atocha*, which was built in Havana, was named for "the most revered religious shrine in Spain."  *Atocha & Margarita Story*, *supra* note 2.

Keys for the *Atocha*.  While they were looking for the cargo of that vessel,[4] in 1980, they came across the *Santa Margarita* wreckage site.  Fisher and his team recovered from that wreck, among other items, gold ingots, including Gold Bar 27.

Later, to promote interest in the maritime history of Florida and the Caribbean, Fisher founded the Museum in nearby Key West.  *See MISSION*, Mel Fisher Maritime Museum, https://www.melfisher.org/mission-values-goals (last visited Mar. 25, 2020).  As we have noted, among other things, Fisher donated to the Museum the item Treasure Salvors inventoried as "Gold Bar 27" from the *Santa Margarita*.

At the Museum, Gold Bar 27 lived its best life.  It became the focus of the Museum's "lift a gold bar" exhibit.[5]  This exhibit allowed visitors to enjoy a close encounter with Gold Bar 27:  visitors could place their hands in a display case and touch, handle, and raise the gold bar without removing it.  As we have noted, during the bar's display in the Museum, probably three to four million visitors picked up the gold bar.  The bar became so famous that the Museum centered its marketing on it.

---

[4] Five years earlier, in 1975, Fisher's team had found part of the *Atocha*, including some of its bronze cannons.  Jay Amberg, *They Were a Ragtag Band of Treasure Hunters Who Spent 16 Years*, Chicago Tribune (July 20, 1990), https://www.chicagotribune.com/news/ct-xpm-1990-07-20-9003010506-story.html.  But it would take another 10 years, until July 20, 1985, for the team to locate a site containing much of the *Atocha*'s cargo.  *Id.*

[5] At the time of the theft in 2010, the Museum had in its collection a total of eight gold bars recovered from shipwrecks.

The marketing must have worked better than the Museum had hoped because in 2010, Goldman and Johnson drove all the way from West Palm Beach to the Museum in Key West, Florida.[6] There, Goldman served as a lookout while Johnson wandered around trying to find something to steal. Surveillance video showed Johnson unsuccessfully attempting to pry open several display cases, while Goldman stood watch. Eventually, Johnson broke off a piece of the case displaying Gold Bar 27, and unfortunately, he did indeed lift the gold bar (in a way the display certainly did not contemplate). Then he and Goldman, the iconic Gold Bar 27 in hand, left the Museum and drove back to West Palm Beach.

That's where Gold Bar 27's luck finally ran out. After stealing the bar, Johnson used the bar as his personal treasure stash, sawing off pieces as he needed money, until just a small piece remained.[7]

**B.**

Eventually the law caught up with Goldman and Johnson. A grand jury indicted them for conspiracy to commit an offense against the United States, in violation of 18 U.S.C. § 371, and theft of major artwork, in violation of 18 U.S.C. § 668. Goldman pled not guilty, and the court set the case for trial.

---

[6] For readers unfamiliar with Florida's geography, this is roughly a five-hour drive in no traffic. Federal Bureau of Investigation Special Agent Rhonda Squizzero testified at trial that it took her six hours to make the drive in traffic.

[7] Johnson's counsel asserted that Johnson gave a sawed-off piece of the bar to Goldman as payment, but Goldman told law enforcement that Johnson left town without paying him the $2,000 Johnson had promised for Goldman's role in the crime. In any case, Gold Bar 27 was destroyed.

Johnson, however, pled guilty to both counts of the indictment. In his factual proffer, Johnson agreed that Gold Bar 27 was worth approximately $556,000.

At Goldman's trial, the government presented evidence detailing the history of Gold Bar 27 and Goldman's role in stealing it, which we have already noted. It also put on evidence explaining how the government eventually discovered that Goldman and Johnson had been responsible for the theft. Specifically, while Johnson was attempting to steal Gold Bar 27, he left an identifiable fingerprint on the display case.

The crime remained unsolved until 2015, when the Monroe County Sheriff's Office received an anonymous tip through "Crime Stoppers." The caller led investigators to Goldman.

In 2016 law enforcement interviewed Goldman, who admitted to serving as a lookout for Johnson while he stole the antique gold bar. During trial, Goldman also stipulated that the gold bar was more than 100 years old and was worth in excess of $100,000. The jury found Goldman guilty as charged.

## C.

Goldman's pre-sentence investigation report ("PSI") valued the stolen gold bar at approximately $556,000, the value the Museum placed on it. It noted that the victims included the Museum and an insurance company (AXA Art Insurance), which had paid a $100,000 insurance claim to the Museum for the theft.

7

As relevant to this appeal, the PSI recommended finding Goldman responsible for a loss amount greater than $550,000, which would result in a 14-level enhancement under U.S.S.G. § 2B1.1(b)(1)(H) and § 2B1.5(b)(1)(B) to Goldman's offense level. The PSI also noted that restitution was mandatory, and it concluded that the total loss in the case was $556,000, with $456,000 owed to the Museum and $100,000 owed to AXA Art Insurance Corporation.

Johnson, who faced the same recommendations, challenged the PSI's valuation of the gold bar, despite his earlier stipulation to that valuation in his factual proffer at the change-of-plea hearing. In particular, he objected to how the value would impact his guidelines offense level and his restitution obligation.

In support of his objections to the valuation, Johnson submitted insurance documents by the Museum's insurance provider, AXA Art Insurance, describing how AXA calculated the value of the gold bar and what the insurance settlement amount would be. According to those documents, AXA did not agree with the Museum's $555,696 valuation of Gold Bar 27. It noted that it had asked the Museum for information as to how a "point system" the Museum used to value artifacts worked, but the Museum had failed to respond.

AXA stated that it valued the gold bar using the methodology set forth in the policy language, which provided coverage for liability for the "current market value" of the property at the time of loss. The policy further explained that "[m]arket value

8

for fine art and collectible property is generally interpreted to be 'the price at which an asset would trade in a competitive auction setting.'"

To calculate what that price would be, AXA identified five auctioned shipwreck gold bars from the *Atocha*, which it deemed comparable to Gold Bar 27. Of those five, AXA relied on the three that had sold at auction in 2009 (the other two bars sold in 2007 and 2008) to determine "current market conditions." Based on its review of the auction prices for the three bars, AXA determined that similar gold bars "sell on average 45 percent above their melt value." Then, AXA calculated Gold Bar 27's melt value to be $63,228.13, based on its weight and purity. Next, AXA added 45 percent to that value for Gold Bar 27's status as a *Santa Margarita* shipwreck bar, along with another 15 percent for Gold Bar 27's "notoriety" and iconic value. Altogether, the sum amounted to $101,165.01.

The district court scheduled Goldman and Johnson to be sentenced on the same day.

## D.

The district court convened Johnson's sentencing hearing first. During the hearing, the government presented evidence on the value of Gold Bar 27.[8] Goldman

---

[8] Counsel for Johnson argued that he was not bound by his previous agreement as to value in the factual proffer because the government had subsequently received information of comparable gold bars that had sold for less. The government acquiesced in its need to prove the value, since it had to do so with respect to Goldman, regardless.

and his attorney participated in that portion of Johnson's sentencing hearing, since the court was determining the value of the gold bar.

Melissa Kendrick, the President and CEO of the Museum, testified that at the time that Gold Bar 27 was stolen, the Museum estimated its value at roughly $550,000. She explained that the Museum arrived at this valuation based on a point system used by the Mel Fisher Investor Division:

> Every artifact . . . when it is found, is appraised and given a value. That value is expressed in points. So for example, this pen in 1985 might have been given 100 points. Today, it is still 100 points. But what changes is the valuation of a point. So that would move with the market, because that is the number of points times the point value would give you the fair market value. The price that a willing buyer and a willing seller would reach in a transaction.

According to Kendrick, when Gold Bar 27 was recovered, it was assigned a value of 8,178 points. Multiplying those 8,178 points by the value of a point at the time of the theft, the Museum determined Gold Bar 27's value to be $556,000.

Kendrick admitted to "hav[ing] no idea what the ongoing value and the fluctuation in points" was. Nor did she explain how the value of a point was determined or why Gold Bar 27 was assigned 8,178 points at the time it was recovered from the wreck of the *Santa Margarita*.

After opining that Gold Bar 27 was worth $556,000, Kendrick recounted that when Gold Bar 27 was stolen, AXA paid out only approximately $100,000. Although Kendrick acknowledged that several other comparably sized gold bars

recovered from the wrecks of the *Atocha* and the *Santa Margarita* had sold for much less than $556,000, she offered a couple of reasons for that.

First, Kendrick said, the other bars were sold at auctions. Therefore, Kendrick reasoned, "the only thing that you can derive from those sales is what a willing buyer and willing seller was prepared to pay. So very, very close to melt value."

Second, Kendrick continued, other gold bars did not have the pedigree that Gold Bar 27 did, as the stolen gold bar was "iconic," unlike the others, which were "ordinary shipwreck bars." She emphasized that during the nearly thirty years Gold Bar 27 was on display at the Museum, about three to four million people had touched it, which, in Kendrick's opinion, had greatly increased the value of the bar:

> Yes, but if a bar is brought up from either of those two shipwrecks and they're put in somebody's sock drawer they don't continue to gather the value for the story that that artifact could tell. If a gold bar belonged to Elvis and Elvis had that bar and did certain things with it, then that would become part of the story and it would enrich the value of that object. We, at the museum, enrich the value of that object by putting it on display and having every one of our visitors have the opportunity to interact firsthand with history.

In short, Kendrick considered Gold Bar 27 to be "priceless" because "there is not another bar to buy to replace it, in all likelihood."

Nevertheless, Kendrick conceded that "[t]he museum is not in the business of buying and selling gold bars or any particular artifacts, so I have no personal knowledge as to what—as to the prices that artifacts have sold for." Kendrick also admitted that she was not aware of a single gold bar from the *Atocha* or *Santa*

*Margarita* wrecks that had sold for even half the price of $550,000.

Kendrick stated that the Museum had not replaced Gold Bar 27 because that would require both the money to pay for a replacement bar and the availability of a replacement bar from a private collector willing to sell it.

The district court accepted the Museum's valuation as proper:

> You know, the thing that troubles me about this particular item is that you can find a value by melting it down and selling it for its weight in gold. And that may be what the people that were selling it and buying it were doing. But if these were rare books, what are they worth, 12 cents? Yet they're worth $100,000. And I think somebody that has something like this in a museum is entitled to place a value, and I think that particularly when one of the parties has agreed that the value is 500-some thousand dollars, I'm not going to go below that.

The district court then sentenced Johnson to a total of 63 months of imprisonment and ordered him to pay restitution in the amount of $580,195.43, jointly and severally with Goldman.[9]

Next, the court convened Goldman's sentencing hearing. After calculating Goldman's offense level at 24 and his criminal-history category at I, with a corresponding guidelines range of 51 to 63 months' imprisonment, the court sentenced Goldman to 40 months of imprisonment for each count, to be served concurrently, followed by three years of supervised release. The court also ordered

---

[9] The difference between $580,195.43 and $556,000, or $24,195.43, reflected an additional insurance company loss. The amount included in the written judgment was for $10,000 less, however, apparently due to a mathematical error in Johnson's favor.

12

Goldman to pay $570,195.43 in restitution, jointly and severally with Johnson.[10]

For the record, Goldman objected to the court's determination of Gold Bar 27's value. Then the government asked the district court whether it would have imposed the same sentence had it not made the determination as to value. The district court responded, "Yes. I would have made the same determination because my position is that it was a priceless work of art."

Goldman now appeals. In Section II, we address his sentencing claim, and in Section III, we consider his objection to the restitution order.

## II.

We begin with Goldman's sentencing challenge. As we have noted, Goldman objects to the district court's valuation of Gold Bar 27 that figured into the court's total offense calculation under the Sentencing Guidelines.

In particular, United States Sentencing Guidelines Manual ("U.S.S.G.") § 2B1.5 sets forth the offense guideline applicable to the crime of theft of cultural-heritage resources. It imposes an enhancement to the basic offense level, depending on the value of the item involved in the crime.[11]  *See* U.S.S.G. §§ 2B1.5(b)(1),

---

[10] The court's restitution amount for Goldman apparently contained the same $10,000 mathematical error that was in Johnson's judgment. *See supra* n.9.

[11] The Application Notes to § 2B1.5(b)(1) instruct, as potentially relevant here, that "the value . . . shall include" both the "archaeological value" and the "commercial value" of the item. U.S.S.G. § 2B1.5(b)(1), cmt. n.2(A). Nevertheless, in determining the "value" for purposes of this guideline, the court may "make a reasonable estimate . . . based on available information." *Id.* at cmt. n.2(B).

13

2B1.1(b) (2016).[12]     For example, a value greater than $550,000 but less than $1,500,000.01 results in an enhancement of 14 points to the basic offense level.  *Id.*

But in this case, we do not dwell on whether the district court correctly ascertained the "value" of Gold Bar 27 for purposes of the Sentencing Guidelines because the court stated that it would have imposed the same sentence regardless of the "value" of Gold Bar 27 as properly calculated under § 2B1.5(b)(1).  And under our precedent in the form of *United States v. Keene*, 470 F.3d 1347, 1349 (11th Cir. 2006), we need not review an issue when (1) the district court states it would have imposed the same sentence, even absent an alleged error, and (2) the sentence is substantively reasonable.  That is so because under those circumstances, we have explained, any error in the guidelines calculation is harmless.  *See id.*

Therefore, we turn to the question of substantive reasonableness.  When we consider the substantive reasonableness of the sentence under a *Keene* analysis, we assume the guidelines error the defendant alleges and reduce the guidelines calculation and its corresponding sentencing range accordingly.  *Id.*; *United States v. Lozano*, 490 F.3d 1317, 1324 (11th Cir. 2007).  Then we assess the substantive reasonableness of the sentence actually imposed, in light of the reduced sentencing range.  *Keene*, 470 F.3d at 1349.

---

[12] As Goldman's sentencing occurred on July 30, 2018, this is the applicable edition of the Sentencing Guidelines.  *See* U.S.S.G. § 1B1.11(a) ("The court shall use the Guidelines Manual in effect on the date that the defendant is sentenced.").

Here, Goldman contends that the court should have calculated the value of Gold Bar 27 at more than $95,000 but less than $150,000.01. Had the court done so, Goldman's resulting offense level would have been 18, with a corresponding guidelines range of 27-33 months. As we have noted, Goldman was, in fact, sentenced to 40 months' imprisonment.

So we must consider whether the 40-month sentence that the district court imposed was substantively reasonable, in light of the 27-33-month guidelines range and the rest of the sentencing record. To conduct this evaluation, we consider the totality of the circumstances and whether the sentence achieves the sentencing purposes stated in § 3553(a). *Gall v. United States*, 552 U.S. 38, 51 (2007). The district court must impose a sentence that is sufficient, but not greater than necessary, to comply with the factors and purposes listed in § 3553(a)(2), including the need to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, deter criminal conduct, and protect the public from the defendant's future criminal conduct. 18 U.S.C. § 3553(a)(2); *United States v. Croteau*, 819 F.3d 1293, 1309 (11th Cir. 2016). The district court also must consider the nature and circumstances of the offense and the history and characteristics of the defendant. 18 U.S.C. § 3553(a)(1). Although the district court must take into account each of the § 3553(a) factors, it need not discuss them specifically; rather, the court's acknowledgement that it has considered the § 3553(a) factors will suffice.

15

*United States v. Turner*, 474 F.3d 1265, 1281 (11th Cir. 2007).

When it comes to weighing the § 3553(a) factors, the district court enjoys great discretion. *United States v. Clay*, 483 F.3d 739, 743 (11th Cir. 2007). Nevertheless, a district court abuses its discretion if it (1) fails to consider relevant factors that were due significant weight, (2) gives an improper or irrelevant factor significant weight, or (3) commits a clear error of judgment by unreasonably balancing the proper factors. *United States v. Irey*, 612 F.3d 1160, 1189 (11th Cir. 2010) (en banc). The defendant bears the burden of proving his sentence is substantively unreasonable, in view of the § 3553(a) factors and the record. *Keene*, 470 F.3d at 1350.

We will vacate a sentence only if we are left with the "definite and firm" conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that is outside the range of reasonable sentences dictated by the facts of the case. *Irey*, 612 F.3d at 1190. We do not presume that a sentence outside the guideline range is unreasonable and must give due deference to the district court's decision that the § 3553(a) factors, as a whole, justify the extent of the variance. *United States v. Rosales-Bruno*, 789 F.3d 1249, 1254–55. A sentence imposed well below the statutory maximum penalty is an indicator of reasonableness. *See United States v. Gonzalez*, 550 F.3d 1319, 1324 (11th Cir. 2008).

16

Accounting for these considerations, we review the substantive reasonableness of Goldman's 40-month sentence. In imposing Goldman's sentence, the district court stated that it had given thought to all the § 3553(a) factors. In particular, with respect to the "nature and circumstances of the offense," 18 U.S.C. § 3553(a)(1), the court emphasized that Gold Bar 27 was a "priceless work of art" and that the "destruction of an artifact that is priceless" is a "bad crime." Indeed, the record reflects that Goldman's actions deprived the Museum and its millions of visitors of the Museum's centerpiece exhibit—an artifact and an experience that, in the Museum's view, can never be replaced. Even though the guidelines had already accounted for the value of the gold bar, we cannot say that, on this record, the district abused its discretion in further accounting for that factor. *See United States v. Amedeo*, 487 F.3d 823, 833–34 (11th Cir. 2007).

Goldman's sentence was approximately two-thirds that of his more responsible codefendant Johnson. And the 40-month sentence fell significantly below the statutory maximum sentence the court could have imposed (60 months for Count 1 and 120 months for Count 2), further indicating the sentence's reasonableness. *See Gonzalez*, 550 F.3d at 1324.

Ultimately, we conclude that Goldman's sentence did not fall outside the range of reasonable sentences dictated by the facts of the case. *Irey*, 612 F.3d at 1190. So we find no abuse of discretion in the district court's sentencing decision,

17

and we affirm Goldman's sentence.

## III.

Next, we address Goldman's restitution challenge.

## A.

We review *de novo* questions of law concerning a restitution order, and we review for clear error the factual findings supporting a restitution order. *United States v. Edwards*, 728 F.3d 1286, 1291 (11th Cir. 2013).

## B.

A district court may order restitution only as a statute authorizes. *Id.* The MVRA requires the district court to grant restitution to all victims once a defendant is convicted of "any offense . . . in which an identifiable victim or victims has suffered a . . . pecuniary loss." 18 U.S.C. § 3663A(c)(1)(B). Section 3664 sets forth the procedures a court must follow under the MVRA. *Id.* § 3663A(d). It requires the court to "order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant." *Id.* § 3664(f)(1)(A).

We have said that "[t]he primary and overarching purpose of the MVRA . . . is to make victims of crime whole, to fully compensate these victims for their losses and to restore these victims to their original state of well-being." *United States v. Collins*, 854 F.3d 1324, 1329 (11th Cir. 2017) (citation and internal quotation marks

omitted).  Restitution should not "provide a windfall for crime victims."  *United States v. Martin*, 803 F.3d 581, 594 (11th Cir. 2015) (citations and internal quotation marks omitted).  Nor is restitution intended to punish the defendant.  *Id.* at 595.  For these reasons, "[a] restitution award must be based on the amount of loss *actually* caused by the defendant's conduct."  *United States v. Huff*, 609 F.3d 1240, 1247 (11th Cir 2010) (citation and internal quotation marks omitted) (emphasis in original).  Where, as here, "return of the property . . . is impossible," the MVRA demands that the defendant shall "pay an amount equal to [ ] the greater of [ ] the value of the property on the date of the damage, loss, or destruction; or the value of the property on the date of sentencing," minus the value of any property returned.  18 U.S.C. § 3663A(b)(1)(B).  The government bears the burden of proving the loss amount—the "value"—by a preponderance of the evidence.  *Id.* § 3664(e).

We first considered the meaning of "value" in § 3663A(b)(1) in *United States v. Shugart*, 176 F.3d 1373 (11th Cir. 1999).  We noted that for fungible commodities, "value" means "the actual cash value, or fair market value, of the item—that is, '[t]he fair or reasonable cash price for which the property could be sold in the market in the ordinary course of business.'"  *Id.* at 1375 (quoting Black's Law Dictionary (6th ed. 1990)); *see also* Value, Black's Law Dictionary (11th ed. 2019) (defining "fair market value" as "[t]he price that a seller is willing to accept and a buyer is willing to pay on the open market and in an arm's-length transaction; the point at which

19

supply and demand intersect"); *cf.* 26 C.F.R. § 20.2031-1(b) ("The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts.").

But when the loss involves a unique item or when no ready market for it exists, fair market value may not be an option. *See Shugart*, 176 F.3d at 1375. So we have explained that when "actual cash value is unavailable or unreliable," we determine value under § 3663A by looking to "replacement cost." *Id.* Replacement cost is "[t]he cost of a substitute asset that is equivalent to an asset currently held." *United States v. Steele*, 897 F.3d 606, 610–11 (4th Cir. 2018) (quoting Replacement Cost, Black's Law Dictionary (10th ed. 2014)).

We have no precedent that directly articulates how a court should determine the value of a unique item stolen from a museum, such as Gold Bar 27. But *Shugart* and its progeny are instructive.

In *Shugart*, we held that the district court did not abuse its discretion in ordering restitution in an amount necessary to rebuild a century-old church that the defendants had burned down. 176 F.3d at 1375. We explained that a church is not a fungible commodity, but rather is unique and "valued by its members, precisely because of its location, its design, and the memories it evokes." *Id.* For these reasons, we observed that simply purchasing a different existing structure

20

elsewhere—that is, determining loss based on actual cash value—could not fill those voids in the same way that "rebuild[ing] a church comparable in size and design on the same lot where the original church stood" could. *Id.* On that basis, we affirmed the district court's use of replacement cost to determine the value of the church.

The Sixth Circuit adopted our *Shugart* analysis in *United States v. Genschow*, 645 F.3d 803, 814 (6th Cir. 2011). There, the defendant had, without authorization, cleared five acres of unpopulated, tribal trust land on the Ontonagon Reservation, owned by the Keweenaw Bay Indian Community ("Community"). *Id.* at 805, 808. The president of the Community submitted a victim-impact statement that described the sacred traditions of the Chippewa and Ojibwe carried out on the land. *Id.* at 810. As the president explained, the unauthorized clearing of the land destroyed the Community's resources and offended its traditions. *Id.* The Sixth Circuit upheld restitution for "the value of the removed timber and the cost of restoring the Property," despite the defendant's objection that the restitution amount should have been based on the fair market value of the land, which would have been lower. *Id.* at 814. The court reasoned that "when destroyed property is unique or lacks an active market such that the actual cash value is unreliable or unavailable, using replacement value as a measure for restitution is proper under the MVRA." *Id.* at 815.

For purposes of ascertaining the best way to establish value under the MVRA,

21

artifacts like Gold Bar 27 are roughly analogous to the unique items lost in *Shugart* and *Genschow*. Like the special aspects of the church in *Shugart* and the sacred ground in *Genschow*, Gold Bar 27's unique properties render actual cash value unreliable and unavailable. So it makes sense to treat Gold Bar 27, the *Shugart* church, and the *Genschow* sacred lands the same way for purposes of valuing them under the MVRA. For that reason, today we reaffirm our holding in *Shugart*: where, because of the unique nature of an item, cash value does not sufficiently compensate under the MVRA for actual loss, a district court should use replacement value to determine restitution.

Of course, using replacement value in a case like this one may be easier said than done. Depending on the nature of the item lost or destroyed, the district court may have to account for various components in determining a replacement cost—some easier to quantify than others. Yet we have recognized that determining the restitution amount "is by nature an inexact science." *Martin*, 803 F.3d at 595 (citation and internal quotation marks omitted). And so where, as here, a precise valuation of a stolen item might not be possible, a court does not abuse its discretion in making a "reasonable estimate of the loss, given the available information." *United States v. Futrell*, 209 F.3d 1286, 1291 (11th Cir. 2000) (citation and internal quotation marks omitted); *see also id.* at 1292. Nevertheless, the district court must explain how it arrived at its loss figure, so we can conduct a review of that

22

determination and ensure it is based on sufficient evidence.  *Huff*, 609 F.3d at 1248.

Here, we are not able to do that.  We know that the district court rejected the idea of valuing Gold Bar 27 based on the auction prices of other gold bars discovered in the wrecks of the *Atocha* and the *Santa Margarita*.  We also know that the court identified the value of Gold Bar 27 to be $556,000, based on Kendrick's testimony that the bar was worth that amount.  Indeed, the court explained that "somebody that has something like this in a museum is entitled to place a value."  But allowing Kendrick to establish the gold bar's value, absent any evidence of her own training in valuating artifacts or of any explanation of the Museum's point system, is not appropriate.  *See United States v. Renick*, 273 F.3d 1009, 1027 (11th Cir. 2001) ("Alleged victims cannot determine their own 'losses.'").[13]

And here, the record contains no explanation of how the Mel Fisher Investor Division's point system, on which the Museum blindly based its $556,000 valuation, works.  Silence in this situation is not golden.  We have no idea, for instance, what the purpose of the Mel Fisher Investor Division point system is.[14]  We also do not

_____

[13] Nor can Johnson's factual stipulation of the value in connection with his own plea somehow satisfy the government's burden as to value for Goldman.  Goldman, in contrast, stipulated at his trial to only a value in excess of $100,000.  And nothing indicates that Johnson is trained in the appraisal of shipwreck treasure.  Nor is the Museum, it appears, for that matter.

[14] Perhaps the Mel Fisher Investor Division point system may be a system Fisher's business devised for distributing recovered treasure items to investors in his operation, based on their investments.  *See Mel Fisher*, The Treasure Wrecks Chronicles:  Treasure Wrecks & Their Discoverers,  http://thethunderchild.com/GhostGunsVirginia/TreasureWrecks/MelFisher.html (last visited Mar. 25, 2020); John Rothchild, *Mel Fisher $44 Million Later or Maybe It's $200 million.  But after that Incredible Memorial Day Discovery, Who's Counting?*, Sun Sentinel (Feb.

know how the Mel Fisher Investor Division determined that Gold Bar 27 was assigned 8,178 points when it was recovered. Nor do we know how many points were assigned to other comparable gold bars recovered at the same time from the same wrecks. We likewise lack information concerning whether any of these comparable gold bars assigned point values were sold at auction or otherwise, and if so, for how much. Also missing is any information about how the valuation of a single point is determined.

In the absence of any evidence establishing the basis for the Mel Fisher Investment Division's point system, we cannot evaluate whether the district court's valuation based on that system was a reasonable estimate of the replacement cost of Gold Bar 27. For that reason, we must vacate the order of restitution and remand to the district court to conduct an evidentiary hearing to determine a reasonable estimate of the replacement cost of Gold Bar 27.

Perhaps the government will be able to put on evidence to establish the reliability of the Mel Fisher Investment Division's point system in determining replacement cost. Perhaps it won't. Or perhaps AXA's valuation better establishes replacement value. Its components appear to attempt to account for what would seem to be all the necessary considerations: (1) melt value; (2) based on sales of

---

9, 1986), http://www.sun-sentinel.com/news/fl-xpm-1986-02-09-8601090476-story.html. If so, it may not tell us much, if anything, about the replacement cost of Gold Bar 27.

comparable gold bars, a premium for the fact that Gold Bar 27 was recovered from the *Santa Margarita*; and (3) a premium for the iconic lift-a-bar-exhibit aspect of Gold Bar 27. But the record contains no indication of how AXA arrived at the 15% premium for Gold Bar 27's unique lift-a-bar-exhibit status. So we do not know whether that 15% premium is reasonable. The district court must consider these questions in the first instance.

## IV.

For the reasons we have explained, we affirm Goldman's sentence, but we vacate the order of restitution and remand for the district court to ascertain the amount of restitution in a manner consistent with this opinion.

**AFFIRMED IN PART, VACATED IN PART, and REMANDED.**