[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-15204

_____

D.C. Docket No. 1:17-cr-20013-JEM-4

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

FREDIS VALENCIA PALACIOS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(April 21, 2020)

Before ED CARNES, Chief Judge, LUCK, and MARCUS, Circuit Judges.

PER CURIAM:

Fredis Valencia Palacios arranged for a boat captain to take three Cuban nationals from Colombia to Panama on what was meant to be one leg of an illegal journey to and into the United States.  What was meant to be did not come to pass.  Instead, the boat captain and another man robbed the three passengers, sexually assaulted one of them, murdered two and attempted to murder the third.

Palacios was not personally involved in the violence.  He was charged with and pleaded guilty to one count of conspiracy to encourage and induce aliens to enter the United States resulting in death, in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(I), and three counts of encouraging and inducing aliens to enter the United States resulting in death, in violation of 8 U.S.C. § 1324(a)(1)(A)(iv).  He was sentenced to 180 months in prison, and he challenges that sentence on several grounds.

## I.    FACTS AND PROCEDURAL HISTORY[1]

In July 2016, two Cuban nationals identified in the record of this case by their initials, E.M.A. and L.S.C., flew from Cuba to Guyana.  From there, they crossed illegally into Brazil, and then into Venezuela, and then into Colombia.

---

[1] A factual proffer was signed by Palacios, his attorney, and the government.  Counsel for the government read the proffer aloud at Palacios' plea hearing, and Palacios agreed that it was accurate and true, that he had signed it, and that he understood it.  The facts set forth in this opinion come from that factual proffer and Palacios' sentence proceedings.

They arrived in Colombia in August 2016 and sought transportation to Panama. They intended to go from Panama to Mexico and then into the United States.

In a hotel in Colombia, they were approached by Fernando Rivera Weir (Weir),[2] who offered to take them to the Panamanian border and told them that he had successfully smuggled aliens into the United States. He showed them Facebook photos of people he claimed to have smuggled, some of whom E.M.A. and L.S.C. recognized from Cuba.

One of E.M.A.'s family members in Miami wired $500 to Weir as a smuggling down payment, and later wired an additional $1,400 to someone designated by Weir. Weir introduced E.M.A. and L.S.C. to one of his "associates," Palacios, who is the defendant in this case. Palacios had worked as a boat captain for Weir in past alien smuggling operations. He informed Weir that he could not transport these migrants to Panama because he no longer had a boat, but he offered to introduce the migrants to Carlos Ibarguen Palacios (Ibarguen), who did have a boat and who had also worked as a boat captain for Weir in the past. Ibarguen had a relationship with Palacios' sister, and Palacios referred to him as his "brother-in-law."

---

[2] The parties refer to some of the conspirators by their first surname and some by their second surname. We will use the same short form of the names that the parties use.

At a hotel, Weir met with E.M.A. and L.S.C. along with Ibarguen and Palacios, and they discussed the route to transport the migrants by boat to Panama. Later, another Cuban national, D.E.L.S., arrived at the hotel and joined the meeting; he had also arranged with Weir to be smuggled into the United States. L.S.C. later testified at Palacios' sentence hearing that Palacios had attended two meetings where he and Weir discussed how they would "cross over" in a boat, and Palacios assured them that "everything would be safe." That assurance could not have been more wrong.

On September 6, 2016, Weir took E.M.A., L.S.C., and D.E.L.S. to meet with Palacios, and Palacios took them to a boat captained by Ibarguen to begin their trip to Panama. Palacios did not get on the boat with them. Instead, Ibarguen launched the boat himself with just he and the three migrants in it. After the boat started taking on water, however, Ibarguen returned to shore and took the migrants to his home to spend the night.

The next day, Ibarguen and Jhoan Stiven Carreazo Asprilla (Carreazo) took the three Cuban nationals on a different boat from Colombia headed toward Panama. Palacios was there when the three victims departed in the boat with Ibarguen and Carreazo, but he did not leave with them.

During that trip, Carreazo brandished a firearm and Ibarguen pulled a knife on the migrants in the small wooden boat. See Appendix 1 (Doc. 117-1, Ex. 1).

4

Ibarguen tied the wrists of L.S.C. and D.E.L.S., threw them overboard, then pulled them up with their heads just above the water and anchored them with a rope to the outside of the boat. From where he was in the water, L.S.C. could not see what was happening to the other two, but he heard Ibarguen and Carreazo sexually assaulting E.M.A. before they cut her throat and murdered her. L.S.C. then heard the killers cut D.E.L.S.' throat and murder him. L.S.C. managed to free himself from the ropes, swim away, and hide in the mangroves. The murderers searched for him a while but eventually gave up and left.

The next day, a local fisherman found L.S.C., and the Colombian Navy rescued him. L.S.C. told Colombian authorities where the murders had been committed, and the authorities found the bodies of E.M.A. and D.E.L.S. Ibarguen and Carreazo had cut open "their throats and bellies," tied the two bodies together, and submerged them in the water.

L.S.C. later identified photographs of Weir, Ibarguen, Carreazo, and Palacios as the men who had agreed to smuggle the group. He identified Ibarguen and Carreazo as the men who had committed the sexual assault and the two murders and had tried to murder him. Ibarguen and Carreazo were arrested in a Colombian hotel. Some of the victims' personal property was recovered from the murderers' hotel rooms, and more of it was recovered from Ibarguen's house along

5

with the firearm that Carreazo had brandished on the boat.  There is no indication that any of the victims' property was in Palacios' possession.

One of E.M.A.'s family members in Miami reported to law enforcement that E.M.A. had contacted her from Colombia and had asked for money for smuggling fees.  That family member had wired $500 and $1,400 from Miami to Colombia to pay the fees.  Another family member in Miami told law enforcement that he "spoke constantly with E.M.A. throughout her journey" and that E.M.A. said she had paid a smuggler named "Fernando"[3] $1,000 to take L.S.C. and her from Colombia to Panama.  E.M.A. sent that family member a photograph of Weir and a phone number that was linked to his social media account.  Business records and social media accounts corroborated what E.M.A.'s family members had told law enforcement.  Additional information obtained from Weir's social media accounts showed that he and his criminal organization had successfully smuggled Cuban nationals into the United States, and some of those people had been transported from Colombia to Panama as part of the journey.

Palacios was charged with one count of conspiracy to encourage and induce aliens to enter the United States resulting in death, in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(I), and three counts of encouraging and inducing aliens to enter

---

[3] Weir's full name is Jorge Fernando Rivera Weir.

the United States resulting in death, in violation of 8 U.S.C. § 1324(a)(1)(A)(iv).

He was arrested in Colombia and extradited to the United States. He pleaded

guilty to those charges without a written plea agreement.[4]

Palacios' Presentence Investigation Report recounted the offense conduct as

set forth in the factual proffer and in Palacios' post-arrest statement.[5]   The PSR

also mentioned some details from Palacios' post-arrest statement, including his

admission that he had worked with Weir and other smugglers in the past as a boat

captain and was paid $150 to $200 per person. The PSR noted that in his post-

arrest statement Palacios said that Weir had asked him to captain the boat, but

Palacios did not have a boat, so he introduced Weir to Ibarguen. Palacios said

Weir was supposed to pay him 100,000 pesos per person for his assistance and

would pay Ibarguen 200,000 pesos per person for the trip. Palacios stated that

because the victims were killed he never received any money.

---

[4] Ibarguen and Carreazo were charged in Colombia with murder, rape, and aggravated robbery. They pleaded guilty and were sentenced to 43.5 years in prison. They were later extradited to the United States and pleaded guilty to the same offenses with which Palacios was charged. Carreazo was sentenced to 600 months imprisonment, and he has appealed, challenging his sentence. See United States v. Carreazo Asprillo, No. 19-10677. Ibarguen was sentenced to 540 months imprisonment, and his appeal of his sentence is also pending. See United States v. Ibarguen Palacios, No. 19-10734. Neither of them challenges his conviction. Weir is a fugitive. Palacios was not charged with a crime in Colombia, but he was held in prison there while awaiting extradition.

[5] There are three PSRs in the record: the first one is dated November 5, 2018; the second is dated November 29, 2018 (an amended PSR with an addendum); and the third one is dated December 11, 2018 (prepared after sentencing). All three recite the facts drawn from the plea hearing factual proffer and Palacios' post-arrest statement.

Also in his post-arrest statement, Palacios admitted that he knew Ibarguen had robbed other Cuban nationals of their cell phones.  He said this about Ibarguen:

> If he went out on the street, and he would go — and, well, he would rob them.  Like, for example, you are walking there on the street.  Do you understand what I'm saying? . . .  And you would have a phone in your hand, and he would take it from you.  And he would take off running, and he would take it. . . .  Yes, he would take it from them, the phones, from the Cubans, every now and then.

Doc. 117-2 at 216–17.

Palacios said that he was not friends with Carreazo but had seen him with Ibarguen and knew that Carreazo was a member of the paramilitary and that he had "bad ideology."[6]  The PSR described Palacios' role in the conspiracy as "assist[ing] in smuggling the aliens by finding [Weir] a pilot of the vessel, such as Ibarguen to ferry the aliens."  Palacios insisted that the plan was only to take the victims to the Panamanian border, and he did not know that Ibarguen and Carreazo intended to rob and kill them.

Palacios' PSR also noted that in a post-arrest statement, Carreazo said that Ibarguen had recruited him to help with the smuggling trip.  Carreazo admitted that

---

[6] Palacios asserted before the district court, and asserts before us, that he did not know about Carreazo's paramilitary connection or his "bad ideology" before the boat trip; instead, he learned about that while they were imprisoned together and awaiting extradition in Colombia. His post-arrest statement does not indicate one way or the other when he learned about Carreazo's ideology.

he and Ibarguen planned to rob the victims because they were told by someone else (an unindicted co-conspirator) that the victims had a lot of money.  He admitted to participating in the sexual assault of E.M.A. and the murder of E.M.A. and D.E.L.S.

The first PSR assigned Palacios a base offense level of 38 under U.S.S.G. § 2A1.2(a), which is the guideline for second degree murder.  There was a 2-level reduction for acceptance of responsibility and another one- level reduction for assisting law enforcement in the investigation of his own conduct under § 3E1.1. That resulted in a total offense level of 35.   With a criminal history category of I, his guidelines range was 168 to 210 months in prison.  The statutory maximum for each count was life.

In his objections to the PSR, Palacios argued, among other things, for the application of § 2L1.1 (the smuggling, transporting, or harboring an unlawful alien guideline with a base offense level of 12) instead of § 2A1.2 (the second degree murder guideline with a base offense level of 38).  That request was not without cost to Palacios, though.  As he recognized, the alien smuggling guideline opened the door to several new enhancements.

First, if the alien smuggling guideline applied, Palacios would be subject to a 10-level enhancement under § 2L1.1(b)(7)(D) because his offense resulted in death.  In his objections to the PSR, Palacios did not contest that enhancement, but

he did contest two others.  He argued that a 4-level brandishing a dangerous weapon enhancement under § 2L1.1(b)(5)(B) should not apply because it was Ibarguen and Carreazo who brandished weapons, not him, and their brandishing could not be attributed to him under the guidelines.  He also argued against a 2-level enhancement under § 2L1.1(b)(6) for intentionally or recklessly creating a substantial risk of death or serious bodily injury.  Again, he asserted that it was Ibarguen's and Carreazo's actions that created the substantial risk, and he could not be held accountable for those actions under the guidelines.

According to Palacios' calculations, his base offense level should have been 12, plus ten because the offense resulted in death, minus three for acceptance of responsibility, resulting in a total offense level of 19.  He also argued for a minor role reduction.  The probation office did not agree with Palacios' objections, including the one about application of the second degree murder guideline.

In its objections to the PSR, the government argued that the second degree murder base offense level guideline did apply, and two points should be added under § 3A1.3 for restraint of a victim.  The probation office agreed, and adding those two points raised Palacios' total offense level to 37.  As a result, his recommended guidelines range went from 168–210 months to 210–262 months.

The district court held a sentence hearing that spanned two days.  On the first day, the parties argued mainly about whether the second degree murder base

10

offense guideline should apply.  The court agreed with Palacios that the alien smuggling guideline should apply instead.  The court found that even if Palacios did know Ibarguen and was present when Ibarguen and Carreazo brought the second boat to transport the migrants, "[t]hat still doesn't prove that [Palacios] knew that these people [Ibarguen and Carreazo] were going to murder and rape people."

The court decided to instruct the probation office to calculate the guidelines range using the alien smuggling base offense level.  And the court  asked the Assistant United States Attorney: "Do you have any evidence that shows that [Palacios] knew that [Ibarguen and Carreazo] had murdered people in the past or that they intended to murder these people?"  She responded, "Not before the Court, Your Honor, no."  To which the court replied: "I didn't think so.  That is what my hang up is."

The next day, after the court had determined that the alien smuggling guideline would apply, the sentence hearing continued.  Palacios conceded that the § 2L1.1(b)(7)(D) ten-level enhancement applied because a death resulted from the offense.  But he argued against the government's attempt to apply the enhancements under § 2L1.1(b)(5)(B) for brandishing a dangerous weapon, under § 3A1.3 for restraining the victim, and under § 2L1.1(b)(6) for intentionally or recklessly creating a substantial risk of death or serious bodily injury.

11

In opposition to all three of those enhancements, Palacios argued that it had not been shown that Ibarguen and Carreazo's conduct was reasonably foreseeable, within the scope of the alien smuggling conspiracy, and in furtherance of that conspiracy. For each of the enhancements, he argued, all three of those elements had to be established or his co-conspirators' actions could not be imputed to him. He insisted that the government had not carried that burden as to any of the three disputed enhancements.

The government's response focused on foreseeability and asserted that even if Palacios could not have known that Ibarguen and Carreazo were going to murder the victims, "[t]hey certainly had given him an indication that they were robbers and he knew that." To support that argument, the government pointed out that in his post-arrest statement, Palacios had admitted this was not the first time he had participated in smuggling aliens and that he knew Ibarguen had robbed Cuban migrants of their cell phones on the street in Colombia.[7] Based on the seriousness and nature of the offense, the government argued for an upward variance and a sentence of 262 months for purposes of deterrence. The government asserted that Palacios was "not merely someone who found a boat, he is not merely somebody

---

[7] As we have noted, in his post-arrest statement, Palacios said that on the street in Colombia Ibarguen would sometimes go up to Cubans who had phones in their hand, take the phone, and "take off running."

who found a boat driver. He is somebody who was involved in a smuggling scheme."

Palacios pointed out that the government had already conceded that the murders were not foreseeable. He argued that he was "a middle man, who procured the boat Captain Carlos Ibar[g]uen and that he had no idea that this superseding intervening crime was going to take place."

Focusing on foreseeability, the court concluded that each of the enhancements applied, and it calculated a total offense level of 31 with a guidelines range of 108 to 131 months imprisonment. Based on the 18 U.S.C. § 3553 factors, it stated that it would "impose a sentence above the advisory guidelines range" and indicated that it would have done so even if the government had not asked. The court went on to explain:

> I believe that this is a crime of [a] horrible nature. I believe that while the rape and murder may not have been foreseeable. . . . The violence and robbery [were] definitely foreseeable. He knew that these people had tendencies that they had — robbery, that they had robbed people. That they were violent people. And I think delivering these people into their hands is inexcusable and just terrible.
>
> So I will make a sentence that is above the — it is above the guideline range. Sentence will be imposed above the advisory guideline range which I think is necessary to provide sufficient punishment and deterrence.

The court imposed a sentence of concurrent terms of 180 months for all four counts.

13

After the sentence hearing, the probation office prepared a final, post-sentencing PSR, which reflected the district court's findings. It set a base offense level of 12 under the alien smuggling guideline and then increased that to 20 because of the firearm brandishing. See U.S.S.G. § 2L1.1(b)(5)(B) ("If a dangerous weapon (including a firearm) was brandished or otherwise used, increase by 4 levels, but if the resulting offense level is less than level 20, increase to level 20."). It added 2 levels because the offense involved intentionally or recklessly creating a substantial risk of death or serious bodily injury to another person. See id. § 2L1.1(b)(6). It added another 10 levels because a person died. See id. § 2L1.1(b)(7)(D). It added 2 levels because a victim was restrained in the course of the offense. See id. § 3A1.3. With 2 levels subtracted because of acceptance of responsibility and one level for assisting the government in the investigation of his own misconduct, Palacios' total offense level was 31. His guidelines range was 108 to 135 months. The statutory maximum on each count was life.

## II.    GUIDELINES ENHANCEMENTS

Palacios contends that the district court erred by imposing all four of the enhancements it did in calculating his guidelines range. We review de novo the district court's application of the sentencing guidelines and review its factfindings only for clear error. United States v. Smith, 480 F.3d 1277, 1278 (11th Cir. 2007).

14

Factfindings are clearly erroneous when, on the record as a whole, we are "left with the definite and firm conviction that a mistake has been committed." United States v. Barrington, 648 F.3d 1178, 1195 (11th Cir. 2011) (quotation marks omitted).

A. Brandishing a Dangerous Weapon and Restraint of Victims

Palacios' base offense level of 12 was increased to 20 because a dangerous weapon was brandished. See U.S.S.G. § 2L1.1(b)(5)(B) ("If a dangerous weapon (including a firearm) was brandished or otherwise used, increase by 4 levels, but if the resulting offense level is less than level 20, increase to level 20."). Another two levels were added because a victim was restrained in the course of the offense. See U.S.S.G. § 3A1.3 ("If a victim was physically restrained in the course of the offense, increase by 2 levels."). It is undisputed that during the course of the offense, Ibarguen and Carreazo brandished dangerous weapons and restrained the victims. But Palacios contends that his co-conspirators' conduct cannot be attributed to him for purposes of calculating his guidelines range.

A co-conspirator's conduct can be attributed to the defendant if it meets the requirements set out in the "Relevant Conduct" guideline. That guideline provides that "in the case of a jointly undertaken criminal activity," all "acts and omissions of others" will be attributed to the defendant if they were:

(i) within the scope of the jointly undertaken criminal activity,
(ii) in furtherance of that criminal activity, and

15

(iii) reasonably foreseeable in connection with that criminal activity.

U.S.S.G. § 1B1.3(a)(1)(B) (emphasis added).

Jointly undertaken criminal activity is "a criminal plan . . . undertaken by the defendant in concert with others, whether or not charged as a conspiracy." U.S.S.G. § 1B1.3 cmt. n.3(A). The undisputed facts establish that Palacios engaged in the jointly undertaken criminal activity of alien smuggling with Ibarguen and Carreazo.  As a result, if Ibarguen and Carreazo's brandishing of the firearm and restraint of the victims were foreseeable, in the scope of, and in furtherance of the alien smuggling conspiracy, it would be relevant conduct attributable to Palacios. U.S.S.G. supp. to app. C, amend. 790, "Reason for Amendment," available at https://www.ussc.gov/guidelines/amendment/790 (last visited Apr. 20, 2020) (explaining that the clarifying 2015 amendment "restructures the guideline and its commentary to set out more clearly the three-step analysis the court applies in determining whether a defendant is accountable for the conduct of others in a jointly undertaken criminal activity under §1B1.3(a)(1)(B)"); see also U.S.S.G. § 1B1.3 cmt. n.3(A) ("[W]hen the conduct of others does not meet any one of the criteria set forth in subdivisions (i) through (iii), the conduct is not relevant conduct under this provision.").

Palacios contends that none of the three requirements has been met for brandishing a dangerous weapon and restraining the victims.  The government

16

responds that all three relevant conduct requirements were met for both enhancements.[8]

As we have mentioned, the government conceded that the murders were not foreseeable. The district court also focused on foreseeability, stating that "the rape and murder may not have been foreseeable," but "[t]he violence and robbery [were] definitely foreseeable." It found that Palacios "knew that these people had tendencies that they had — robbery, that they had robbed people."

The district court did not clearly err in finding that the robbery was a foreseeable part of the alien smuggling conspiracy. Palacios admitted that he knew Ibarguen had committed robberies in Colombia, robbing Cuban migrants of their cell phones, which means he was aware of Ibarguen's history of robbing vulnerable people who were in unfamiliar surroundings. In light of that, it was not clearly erroneous to find that it was foreseeable to Palacios that Ibarguen would rob the migrants during the trip to the Panamanian border. And if robbery is

---

[8] The victim restraint guideline, U.S.S.G. § 3A1.3, is a victim-related adjustment, and it is written in the passive voice. It imposes a 2-level enhancement when a victim "was physically restrained" in the course of an offense and says nothing about who restrained the victim. Id. (emphasis added). An argument could be made that, as a result, the three relevant conduct requirements do not apply to the § 3A1.3 enhancement, and it applies whenever a victim was restrained regardless of those requirements. But the government has not made that argument, either in the district court or in its brief to this Court. For that reason and for purposes of this case only, we will assume without deciding that Ibarguen and Carreazo's restraint of the victims cannot be imputed to Palacios unless the scope, furtherance, and foreseeability requirements of the relevant conduct provision have been met.

17

foreseeable, brandishing a dangerous weapon and restraining the victim are also foreseeable. The application note about the "reasonably foreseeable" requirement is instructive about that:

> [T]wo defendants agree to commit a robbery and, during the course of that robbery, the first defendant assaults and injures a victim. The second defendant is accountable for the assault and injury to the victim (even if the second defendant had not agreed to the assault and had cautioned the first defendant to be careful not to hurt anyone) because the assaultive conduct was within the scope of the jointly undertaken criminal activity (the robbery), was in furtherance of that criminal activity (the robbery), and was reasonably foreseeable in connection with that criminal activity (given the nature of the offense).

U.S.S.G. § 1B1.3 cmt. n.3(D). The reasoning of that application note confirms that violent or "assaultive" conduct that occurs during a robbery is a foreseeable part of robbery. The district court did not clearly err in finding that the robbery was a foreseeable part of the alien smuggling conspiracy and in turn that brandishing a firearm and restraining the victims were foreseeable actions during the robbery.

The district court made no findings, however, about whether the robbery was within the scope of and in furtherance of the alien smuggling conspiracy. It should have. We might examine the record to determine if we could mine from it enough facts to convince us that the district court implicitly found enough facts to satisfy the scope and furtherance requirements of relevant conduct. See United States v. Petrie, 302 F.3d 1280, 1290 (11th Cir. 2002). But in light of all the circumstances,

18

we think it better to remand the case to the district court with instructions for it to enter the necessary findings to resolve the remaining relevant conduct questions.

In doing so, we note that even if the district court enters findings precluding application of the brandishing of a dangerous weapon and restraint of a victim enhancements, it is not precluded from imposing the same sentences it did by way of an increased upward variance.  See United States v. Williams, 431 F.3d 767, 774 (11th Cir. 2005) (Carnes, J., concurring) (noting that whatever the district court "decides the advisory guidelines range is in light of what we have said, it still must consider the same 18 U.S.C. § 3553(a) factors that it did initially in deciding the appropriate sentence in this case"); cf. United States v. Keene, 470 F.3d 1347, 1350 (11th Cir. 2006) (explaining that "it would make no sense to set aside this reasonable sentence and send the case back to the district court since it has already told us that it would impose exactly the same sentence"); United States v. Goldman, 953 F.3d 1213, 1221 (11th Cir. 2020) (explaining that under Keene "we need not review an issue when (1) the district court states it would have imposed the same sentence, even absent an alleged error, and (2) the sentence is substantively reasonable" because any error in the guidelines calculation is harmless).

### B.  Enhancement for Intentionally or Recklessly Creating a Substantial Risk of Death or Serious Bodily Injury

19

Palacios also contends that the district court erred by enhancing his sentence two levels for intentionally or recklessly creating a substantial risk of death or serious bodily injury under U.S.S.G. § 2L1.1(b)(6). He argues that enhancement does not apply because murdering, raping, or injuring the migrants was not in the scope of the alien smuggling conspiracy. Regardless of the scope of the conspiracy, that contention fails. Even apart from the terrible crimes that Ibarguen and Carreazo committed on the boat, the record supports the application of the enhancement based on Palacios' own conduct.

Palacios was directly involved with the logistics of the alien smuggling conspiracy, including the dangerous mode of transportation that was used. He introduced the migrants to Ibarguen and recommended him as a boat captain. He attended meetings with Weir, Ibarguen, and the victims, planning the route that would be taken. L.S.C. testified that Palacios assured them that they would be safe. Despite those assurances, the first boat almost sank. The second boat, which was to carry five people nearly fifty miles from Colombia to the Panamanian border across the Gulf of Uraba, was a small, rickety wooden contraption that did not even have seats for the passengers. The photograph of it, which the government introduced as evidence, proves that the migrants were subjected to substantial risk of injury by the mode of transportation that Palacios secured for their journey. See Appendix 1 (Doc. 117-1, Ex. 1).

The evidence established that Palacios put the migrants on the first boat that almost sank, and L.S.C. testified that Palacios was there the next day when they got on the second boat that was also unfit for the voyage. Even if the victims had not been robbed, raped, and murdered, Palacios was justifiably held accountable for recklessly creating a substantial risk of death or serious bodily injury because he put them on that small, unseaworthy boat with Ibarguen and Carreazo. See U.S.S.G. § 2L1.1 cmt. n.3 (defining reckless conduct for purposes of the enhancement as including "carrying substantially more passengers than the rated capacity of a motor vehicle or vessel").

### C.  Enhancement for an Offense Resulting in Death

Palacios also contends that the district court erred by imposing a ten-level enhancement under U.S.S.G. § 2L1.1(b)(7)(D) for an alien smuggling offense that resulted in death. We will not address the merits of that contention because even if the district court did err in applying this enhancement, any error would be invited. "Where a party invites error, the Court is precluded from reviewing that error on appeal." United States v. Brannan, 562 F.3d 1300, 1306 (11th Cir. 2009) (quotation marks omitted). If it was error to apply § 2L1.1(b)(7)(D), Palacios invited it not once, not twice, but three times. The first time was in his objections to the first PSR. Palacios argued that the alien smuggling guideline should set the base level for the offense, and if it did, the 10-level § 2L1.1(b)(7)(D) enhancement

21

would apply because the offense resulted in death.  See Second PSR, Addendum at 6 ("Furthermore, counsel comments that if the court find[s] that the §2L1.1 [alien smuggling] guideline is applicable, the total offense level would be 19 after the application of a 10-level enhancement for resulting in death, pursuant to § 2L1.1(b)(7)(D).").

The second time Palacios extended the court an invitation to apply § 2L1.1(b)(7)(D) was during the first day of the sentence hearing, when the court and counsel for Palacios were discussing the application of the alien smuggling guideline.  They had this exchange:

> COUNSEL FOR PALACIOS: The only applicable guideline is the alien smuggling guideline under these facts.
> Here is what I propose to the Court should be the guideline calculation.  The base offense under 2L1.1, is twelve.
>
> THE COURT: Then you had four, add four.
>
> COUNSEL FOR PALACIOS: You add ten because of the resultant death.

Doc. 134 at 23.

The third of the three invitations was made on the second day of the sentence hearing.  Counsel for Palacios said: "We agree obviously that the base offense level is 12, and we also agree that there should be a ten level bump up, because there was a resulting death as set forth in the indictment."  Doc. 135 at 8.

Any error concerning the resulting in death enhancement was not just invited but thrice invited, and "[w]here invited error exists, it precludes a court from invoking the plain error rule and reversing." United States v. Silvestri, 409 F.3d 1311, 1327 (11th Cir. 2005) (quotation marks omitted).

### III. MINOR ROLE REDUCTION

Palacios also contends that the district court erred by refusing to grant him a 2-level minor role reduction. We disagree.

A defendant may receive a mitigating role reduction if he "plays a part in committing the offense that makes him substantially less culpable than the average participant in the criminal activity." U.S.S.G. § 3B1.2 cmt. n.3(A). The defendant bears the burden of proving his minor role by a preponderance of the evidence. United States v. Rodriguez De Varon, 175 F.3d 930, 939 (11th Cir. 1999) (en banc).

To receive the 2-level minor role reduction that Palacios contends he should have gotten, he was required to show that he "is less culpable than most other participants in the criminal activity," even if his role could not be described as minimal. U.S.S.G. § 3B1.2 cmt. n.5. A defendant whose role is "minimal" is "plainly among the least culpable of those involved in the conduct of a group." Id. cmt. n.4.

An application note to the mitigating role guideline lists some factors to consider when determining whether a defendant's role was minor:

> (i) the degree to which the defendant understood the scope and structure of the criminal activity;
>
> (ii) the degree to which the defendant participated in planning or organizing the criminal activity;
>
> (iii) the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;
>
> (iv) the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts; [and]
>
> (v) the degree to which the defendant stood to benefit from the criminal activity.

U.S.S.G. § 3B1.2 cmt. n.3(C). A district court's determination of a defendant's role in an offense is a factfinding that is reviewed only for clear error. See Rodriguez De Varon, 175 F.3d at 937.

The relevant considerations are Palacios' role in the relevant conduct for which he was held accountable at sentencing and his conduct as compared to that of the other participants. See id. at 940. Even if firearm brandishing and restraining of the victims were not considered relevant conduct for Palacios, the district court did not err, much less clearly err, in finding that he was not entitled to a minor role reduction.

24

Palacios arranged for Ibarguen to captain the boat.  And he attended meetings where he and the other conspirators discussed the plan to transport the migrants by boat and the route they would take.  And he delivered the migrants into Ibarguen's hands not just once but again a second time after Ibarguen's first boat almost sank.  As the district court noted, Palacios was "an essential part of . . . putting the whole thing together.  Without him . . . these people would not have had contact with" the murderers, Ibarguen and Carreazo.  It is clear that Palacios "understood the scope and structure" of the alien smuggling scheme, "participated in planning [and] organizing the criminal activity," "exercised decision-making authority or influenced the exercise of decision-making authority," and personally performed some of the acts, without which the crime could not have been committed.  See U.S.S.G. § 3B1.2 cmt. n.3(C)(i)–(iv).  Even though Palacios claims that he was not paid, he admitted that he was supposed to be paid 100,000 Colombian pesos per person.  So he also "stood to benefit from the criminal activity."  Id. § 3B1.2 cmt. n.3(C)(v).  His role was not minor, and the district court did not err by refusing to grant him a mitigating role adjustment.

IV.    PROCEDURAL AND SUBSTANTIVE REASONABLENESS

Finally, Palacios contends that his sentence is procedurally and substantively unreasonable.  We do not address those arguments since we have decided to vacate

his sentence because the district court did not make all of the necessary relevant conduct findings in its application of the enhancements under U.S.S.G. §§ 2L1.1(b)(5)(B) and 3A1.3.  See United States v. Mock, 523 F.3d 1299, 1304 n.2 (11th Cir. 2008) (declining to address the defendant's reasonableness arguments because his sentence was vacated and remanded for another reason).

**AFFIRMED IN PART; VACATED IN PART AND REMANDED.**

# ATTACHMENT 1